**BAGGETT TRANSPORTATION COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 9984.**

United States District Court
N. D. Alabama, S. D.
May 28, 1962.

Lange, Simpson, Robinson & Somerville, J. A. Simpson and Ormond Somerville, Birmingham, Ala., James W. Wrape and James N. Clay, III, of Wrape & Hernly, Memphis, Tenn., and Washington, D. C., for plaintiff.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Attorney, Department of Justice, Washington, D. C., and Macon L. Weaver, U. S. Atty., Birmingham, Ala., and Robert W. Ginnane, General Counsel and H. Neil Garson, Associate General Counsel, for Interstate Commerce Commission, Washington, D. C., for defendants.

Before RIVES, Circuit Judge, and LYNNE and GROOMS, District Judges.

GROOMS, District Judge.

This action was brought by Baggett Transportation Company under 28 U.S. C.A. §§ 2321–2325, to enjoin, annul and set aside certain orders of the Interstate Commerce Commission issued in Baggett Transportation Company Purchase—Hunt Freight Lines, Inc., Docket No. Mc–F–6034. The question presented is whether the Commission had the power after issuing a certificate of convenience and necessity on August 30, 1960, to amend certain orders entered prior to the issuance of the certificate, thereby imposing protective labor provisions for Hunt's employees.

On July 25, 1955, Baggett and Hunt filed a joint verified application with the Commission seeking the approval of the purchase by Baggett of certain certificates of convenience and necessity and specified properties owned by Hunt. Included in the application were the following sworn statements:

"Transferee (Baggett) would employ all of transferor's (Hunt) employees.

"The approval of this transaction will not adversely affect the interests of the carrier employees of Hunt. While it is contemplated that common terminals will be eliminated, the employees of Hunt in such terminals will be absorbed by Baggett." (This language was italicized in the original application.)

Under the General Rule of Practice No. 1.19 of the Commission, such statements are taken as part of the record and accepted as evidence unless specifically denied in a counterpleading.[1] Baggett claims that these statements were specifically denied by the protest of Malone Freight Lines, an intervenor, who specifically denied all the allegations of the application. We question whether a general denial of all the allegations in the application puts all the allegations in issue merely by including the word "specifically," but in any case, we need not face that issue since we are of the opinion that Hunt's employees represented no valid interest of the intervenor so that Malone had no standing to put these sworn promises in issue. Hearings on this application and one other between Baggett and Holloway Transfer Co., Inc., were held in Birmingham, Alabama, on December 4–8, 1955. The testimony in the Hunt hearing with respect to the issue of Hunt's employees was brief. Whatever the Baggett officials intended their testimony given at the hearing to mean, it cannot be interpreted as a denial of the statements in the application.[2]

From this record, the Examiner indicated in his report of May 24, 1956, that "Baggett would employ those employees of Hunt and Holloway which meet its standards." In actual fact there was nothing in the Baggett-Hunt record which withdrew the promises to employ all of Hunt's employees; the "standards" qualification appears only in testimony with respect to the Holloway transaction. The Commission in its later

1. Rule 1.19, 49 C.P.A. 1.19, states:

*"Pleadings part of record.* Recitals of material and relevant facts in a pleading filed prior to oral hearing in any proceeding, unless specifically denied in a counterpleading filed under these rules, shall constitute evidence and be a part of the record without special admission or incorporation therein, but if request is seasonably made, a competent witness must be made available for cross-examination on the evidence so included in the record. Pleadings may contain specific reference to or quotation from the tariffs or schedules containing the several rates, fares, charges, schedules, classifications, regulations or practices alleged to be material."

2. Raymond H. Jones, Director of Traffic for Baggett, testified in part:

"Q. With respect to the Hunt employees at Chattanooga and Rome, and Gadsden, have you made any proposal with respect to taking any or all of those employees?

"A. Well, I'm sure we're going to be able to use them. We haven't made any commitments yet, but I'm sure that we will be able to use them.

"Q. But you propose, if—suppose that they all would make application and you would be able to place them, if you can, throughout your operation?

"A. Yes, sir.

"Q. Mr. Jones, would it be fair to state that it's your opinion, based on your experience with the applicant, that additional employees would be needed but you're not in position to state the number or locations?

"A. That is true.

"Q. All right. And did I also correctly understand your testimony that, in so far as the present employees of Hunt are concerned, that no arrangements, negotiations with any of them have been undertaken by Baggett?

"A. Not than, other than was brought out in the contract.

"Q. That is, the contract between Mr. Osborne and Mr. Jones?

"A. That's correct.

"Q. And in so far as the other employees of Hunt are concerned, that there have been no arrangements or negotiations with them?

"A. No, sir; there's been no commitments made. I've talked with one or two of them, but other than that, that's all.

"Q. Have you made any investigation—

"Mr. Bishop: Strike that.

"Exam. Collins: Are you prepared to talk over these employees?

"The Witness: Yes, sir."

reports of October 22, 1956, and March 1, 1957,[3] approved the transfer without any mention of Hunt's employees.

On May 18, 1957, Baggett consummated the transaction with Hunt. Ten days later, by means of a Petition for Leave to Intervene and Motion to Vacate Order or Afford Relief, the Union representing Hunt's employees objected to the approval of the transaction on the ground that Hunt's employees were adversely affected contrary to the promises in the application. It is alleged that on May 7, nine days prior to the consummation of the transaction, Hunt discharged all its drivers and warehousemen and that Baggett refused to employ them. This petition for leave to intervene was denied by Commissioner Mitchell on behalf of the Commission on July 17, 1957, "for the reason that the proceeding is closed and intervention in the proceeding is not warranted at this late date." On August 16, 1957, the Union filed a Petition for Reconsideration by the entire Commission. On August 30, however, and pending disposition of said petition, a certificate of convenience and necessity covering the rights purchased was issued by Division 1 of the Commission.

On September 3, 1957, Baggett answered the petition for reconsideration and on December 6 the Commission, Division 4, granted the petition and reopened the proceeding on the then existing record. On April 9, 1958, Division 4 rendered a report upholding the Union and recommending that Hunt's employees be given three months' severance pay. This report and order was vacated by the full Commission and remanded for a hearing by an Examiner since the dispute involved evidence not a part of the record. After a full hearing in July, 1959, the Examiner issued a report on March 25, 1960, affirming the former recommendations of Division 4 that, due to the failure of Baggett to live up to the statements made in its application, protective labor provisions should be add-ed to the earlier orders providing for three months' severance pay for Hunt's employees. The Examiner's report was affirmed on March 29, 1961, by the full Commission.

From the evidence already outlined, supra, we are satisfied that Baggett never withdrew the sworn statements in its application prior to the final approval of the transaction by the Commission in its order of March 1, 1957. If Baggett had intended to withdraw or modify these statements at the hearing, it should have done so clearly and expressly. As noted, these statements were part of the record under Rule No. 1.19 and could be relied on by the Commission. Under the statutory standards for the approval of this transaction found in Section 5(2) (c) of the Interstate Commerce Act, 49 U.S.C.A. § 5(2) (c), it was the duty of the Commission to give weight to the following consideration, among others: "(4) the interest of the carrier employees affected." We are, therefore, of the opinion that the Commission relied upon the sworn statements in the application in its determination that this transaction was in the "public interest."

Baggett first argues that it actually lived up to the statements made in the application. It would appear undisputed, however, that there were 25 employees on Hunt's last full payroll, 17 of which were represented by the Union. Of these, two managerial employees were hired by Baggett, but none of the others received unqualified employment offers. At best, four of Hunt's drivers were offered contracts to serve Baggett as individual owner-operators, provided they were willing to purchase their own tractor-trailers (which Baggett offered to help finance). This is clearly not an unrestricted offer of employment. Baggett argues, however, that unrestricted offers were made to all of Hunt's employees by Chattanooga Service, Inc., who, as of May 1, 1957, handled all of Baggett's terminal operations as an in-

---

3. By the order of the full Commission of March 1, 1957, the report and order of Division 4 became effective on that date.

dependent contractor. This first became clear to the Commission during the July 1959 hearings. At that time, Howard Durden, Baggett's Vice President, testified that during 1957 Baggett changed its former mode of operations and, instead of conducting its own terminal operations as represented in its application, it hired Chattanooga Service as an independent contractor to take them over. Assuming that an offer made by Chattanooga Service may be considered to be an offer by Baggett, Baggett indicates in its brief, with citations to the record, that Chattanooga Service offered employment to five Hunt employees (other than the two managerial employees mentioned above) during May, 1957. Most of these had left by June, however, due to fear of Union reprisals. This leaves some 17 Hunt employees who never received an unqualified offer of employment by either Baggett or Chattanooga Service prior to June, 1957. Upon these facts, the Commission was entitled to conclude that Baggett had not lived up to the statements made in the application.

Baggett contends that Chattanooga Service sent out offers of employment to all the rest of Hunt's employees in late September, 1957 (after it appeared that the Union petition to intervene might be entertained). This offer, six months after Hunt's employees were fired, could correctly be ignored by the Commission as too late to have any practical effect; further, testimony cited by the Government indicates that Chattanooga Service could only have hired two or three of them at that time and that the effort was made for the record only.

For the reasons presently indicated, we are of the opinion that, notwithstanding the issuance of the certificate of convenience and necessity, the Commission had authority to modify and supplement the report and order of Division 4, of October 22, 1956, notice and hearing having been had, by imposing an employee protective condition for the failure of Baggett to abide by material statements asserted in its application.

At the conclusion of its report and order of March 29, 1961, the Commission stated:

"We are reluctant to institute revocation proceedings or even move to temporarily suspend the certificate issued to Baggett with the ensuing loss of customers and interruption of employment for employees, especially since it has been the established policy of the Commission to go no further than to require 3 months' severance pay for displaced employees.

"Upon further hearing we affirm the findings in the prior report, decided October 22, 1956, as modified in the report on reconsideration, decided April 9, 1958."

Thus, it is seen that the Commission did not purport to revoke or suspend the certificate issued to Baggett nor to amend it as such, nor to curtail its operations.

Did the Commission have power to enter the supplemental order imposing the employee protective conditions? Section 5(9), 49 U.S.C.A. § 5, par. (9), provides that:

"The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph * * * (2) * * * as it may deem necessary or appropriate."

The rationale of the pertinent decisions of the Supreme Court carefully gleaned from the settings of those decisions sustain the power of the Commission.

The most recent pronouncements of the Supreme Court with respect to the matter with which we are here concerned were made in Civil Aeronautics Board v. Delta Air Lines, Inc., 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869, decided June 12, 1961, and subsequent to the date of the last order of the Commission made in this case. The case involved the powers of the Civil Aeronautics Board to alter a "certificate" after the same had become effective. The certifi-

cate was issued and became effective while numerous petitions, including that of Lake Central Air Lines, Inc., were pending. Thereafter, the Board issued a new order disposing of the pending petitions. By this order the Board amended the certificate in response to the restrictions proposed by Lake Central. The Board barred Delta's operations between ten pairs of intermediate cities unless the flights initiated at Atlanta or points farther south; the effect of this order was to bar certain Delta flights Delta was then operating. The Board's disposition of the petitions "was taken summarily, without formal notice to the parties or opportunity for hearing prior to decision." The Court, four judges dissenting, held that Congress had not authorized the Board to alter, without formal notice or hearing, a certificate once the certificate had gone into effect. 49 U.S.C.A., § 1371(f) (g). In the course of its opinion, the Court said:

"We are not saying that the Board cannot entertain petitions for reconsideration after effective certification, nor are we holding that such petitions cannot be *denied* summarily; all we hold is that the petitions cannot be granted and the certificated carrier's operations curtailed without notice or hearing. * * *"

The Court again reemphasized the limit of its decisions and pointed to the power of the Commission with respect to the reconsideration of an effective certificate, saying:

"In the first place, it bears repetition that we are *not* deciding that

the Board is barred from reconsidering its initial decision. All we hold is that, if the Board wishes to do so, it must proceed in the manner authorized by statute. Thus, for example, *the Board may reconsider an effective certificate at any time if it affords the certificated carrier notice and hearing prior to decision * * *.*" (Emphasis supplied.)

Adverting to United States v. Rock Island Motor Transport Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391, where it was held that the Commission could modify a motor carrier's certificate pursuant to a reservation in the initial order, the Court stated:

"However, two important distinctions between that case and this are apparent: (1) *The Motor Carrier Act makes express provision for summary modifications after certification,* 49 U.S.C. § 308,—[4] and (2) the Court in Rock Island was very careful to limit its holding to the particular modification made in that case." (Emphasis supplied.)

In Footnote 11, 367 U.S. at page 328, 81 S.Ct. at page 1620, the Court noted that:

"* * * Congress has shown no intent to preclude reconsideration, either judicial or administrative, after notice of hearing."

It will be observed that we have here no question of action taken to execute a subsequently adopted policy as was the case in United States v. Seatrain, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947).[5]

---

4. Title 49 U.S.C.A. § 308, provides:
"* * * and there shall, at the time of the issuance (of the certificate) *and from time to time thereafter*, be attached to the exercise of the privileges granted by the certificate such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require."

5. The Court noted that Seatrain's application was not reopened until the Commission's decision in Foss Launch & Tug

Co., 260 I.C.C. 103, where the Commission had ruled for the first time that a certificate to carry "commodities generally" did not authorize water carriage of loaded or unloaded freight cars. The Court then stated:
"Since the proceedings apparently were not reopened to correct a mere clerical error *but were more likely an effort to revoke or modify substantially Seatrain's original certificate under the new policy announced in the Foss case,* the question remains whether the Act au-

The statute, 49 U.S.C.A. § 5(2)(c), provides that:

"In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) * * (2) * * * (3) * * * (4) the *interest of the carrier employees affected.*" (Emphasis supplied.)

In Transcontinental Bus System, Inc., 50 M.C.C. 305, 310 (1948), the Commission reserved jurisdiction for a period of two years to impose such employee protective condition as may appear necessary. Jurisdiction was reserved for three years for a like purpose in Greyhound Corporation, 67 M.C.C. 123, 155–157 (1950). And in Short Line, Inc., 75 M.C.C. 33, decided February 10, 1958, certain carrier employees were afforded protection by the Commission's order. See also, United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208, as to the policy respecting the protection of railway employees, and Western Air Lines v. Civil Aeronautics Board, 9 Cir., 194 F.2d 211, as to air line employees.

The action of the Commission in entering the supplemental order for the protection of Hunt's employees was in keeping with an established policy clearly inferred from the statute, § 5(2)(c)(4), and consistently followed by the Commission.

Although Lake Central's petition for reconsideration was pending in Delta Air Lines, as was the Union's petition here, when the certificate was granted, that case, as noted, turned on the lack of notice and opportunity for a hearing. After Division 4 reopened the proceedings in this case on December 6, 1957; and following that Division's report and order of April 9, 1958, the Commission as a whole, by order of April 17, 1959, reopened the proceedings for further hearing. A further hearing was had with full opportunity to present evidence. The proceedings closely paralleled those in American Trucking Association, Inc., v. Frisco Transportation Company, 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172, where the issue presented was whether the Commission had the power to modify a certificate issued due to inadvertence. The Court held that the power existed. There was no question of notice and opportunity for a hearing.

In United States v. Seatrain Lines, Inc., supra, the Commission reopened the proceedings on its own motion, cancelled the certificate and directed the issuance of a new one, which deprived Seatrain of the right to carry "commodities generally," as authorized by the initial certificate and limited it to carrying liquid cargoes in bulk, empty railroad cars, and property loaded in freight cars received from and delivered to rail carriers. In affirming the District Court in reversing the Commission, the Court stated that the certificate marked the end of the proceedings, but significantly it added:

"The certificate, when finally granted *and the time fixed for the rehearing it has passed,* is not subject to revocation in whole or in part except as specifically authorized by Congress." (Emphasis supplied.)

In Delta Air Lines, Seatrain, and American Trucking Association, Inc., the issue was with respect to the power of the Commission to modify an existing "certificate," as distinguished from the supplementing or modifying of an "order."

As observed by the Court in Seatrain, 329 U.S. p. 432, 67 S.Ct. 435, and in Delta Air Lines, 367 U.S. p. 327, 81 S.Ct. p. 1620, Footnote 10, the word "order" and the word "certificate" as employed in the statute denote something different. Section 5(9) empowers the Commission to make supplemental "orders," while §

thorizes such alterations." (Emphasis supplied.)
See also, American Trucking Association, Inc. v. Frisco Transportation Company,

358 U.S. 133, 146, 79 S.Ct. 170, 3 L.Ed. 2d 172.

212(a), 49 U.S.C.A. § 312, empowers it to amend or revoke a "certificate," permit or license. Therefore, it will not do to extend to the limit the analogy of an "order" to a "certificate"; and the error is compounded when the analogy is predicated on the premises that the "hearing" required must be "prior to decision," and only in a separate and plenary proceeding,[6] and that an order cannot be supplemented except upon a showing of fraud or inadvertence. This is not to say that by the agency of an order the Commission may devitalize a certificate. That case is not here presented.

While we agree that the Commission has inherent power to amend any order infected by or to change any certificate procured by fraud without reference to 49 U.S.C.A. § 312, we strongly believe that there is in this record no substantial evidence to support a finding that Baggett misrepresented its intention to absorb Hunt's employees in its verified application of July 25, 1955, or that it intentionally abandoned its purpose to do so before the issuance of the certificate on August 30, 1957.

As heretofore noted, Delta Air Lines had not been decided when the final decision was rendered by the Commission. Although the decision was adverse to the Commission, the impact of that decision cannot be overlooked.

■ The Commission having concluded on controverted evidence that Baggett had not complied with the terms of its application with regard to employee protection, we are of the opinion, apart from inadvertence and fraud, that under the teaching of Delta Air Lines, the Commission, after due notice and opportunity to be heard, had the power under Section 5(9) to supplement and modify its original order. In Delta there was neither inadvertence [See footnote 7, p. 329 of 367 U.S., p. 1618 of 81 S.Ct.] nor fraud, yet, as heretofore noted, the Court conceded that:

" * * * the Board may reconsider an effective certificate at any time if it affords the certificated carrier notice and hearing prior to decision."

If a certificate can be reconsidered after notice and hearing so may the order in issue under the facts here presented.

■ The failure to abide by the material statements asserted in the application, although arising from a mere breach of obligation to do so, would, in our opinion, constitute "good cause shown" [§ 5(9)] for supplementing an order based upon such application, where, as here, the proceedings to redress the failure were *in fieri* when the certificate was issued and notice and opportunity to be heard was afforded the carrier.

In addition to what we have heretofore said, we make it plain that we limit our result to the special facts of this case which include the pendency of an application for reconsideration undisposed of at the time of the issuance of the certificate and notice and opportunity to be heard afforded Baggett before amendment of the order underlying such certificate.

Under the facts of this case and the applicable statutes and decisions, the plaintiff is not entitled to the relief prayed for, and this action is due to be dismissed. An order of dismissal will be prepared and entered.

RIVES, Circuit Judge (concurring specially).

I concur in the result reached by my colleagues but do not feel that 49 U.S.C.A. § 5(9) alone is sufficient authority to justify the Commission's action under the circumstances of this case. For involved herein is not just the power of the Commission to supplement an order issued pursuant to 49 U.S.C.A. § 5(2), but its power to alter the conditions

---

6. See Footnote 13, 367 U.S. p. 331, 81 S.Ct. p. 1622, in Delta Air Lines, and

dissenting opinion on pages 338–339, of 367 U.S., at pages 1625–1626 of 81 S.Ct.

upon which Baggett may retain a certificate of convenience and necessity. A wide variety of orders are contemplated by section 5(2) of the Interstate Commerce Act. Many involve orders of approval of contracts by the Commission which have no relation to a certificate, such as contracts for joint yard operations by railroads. However, in the case of the transfer of a certificate the proceeding culminates in the issuance of a new certificate to one of the parties. The question then arises: Can an order, which purports to alter only the order of approval of the transfer but which in fact alters the conditions upon which the transferee may retain the certificate of convenience and necessity, be issued without complying with the statutory provisions for altering a certificate. The opinion of the court deals with this in two ways: First, it argues that Baggett's certificate has not been altered, and, second, it indicates that even if the certificate has been altered in some way, the recent case of Civil Aeronautics Board v. Delta Air Lines, Inc., 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), requires only that Baggett be given adequate notice and a hearing before the change. I disagree with both premises.

The Court in Delta Air Lines emphasized that, by including strict provisions for the alteration of certificates of convenience and necessity, Congress was concerned with protecting the "route security" of the carriers, "providing assurance to the carrier that its *investment in operations* would be protected insofar as reasonably possible." 367 U.S. at 324, 81 S.Ct. at 1618. While the Court was there interpreting the certificate modification provisions of the Federal Aviation Act, the Interstate Commerce Act, 49 U.S.C.A. § 312(a) has the almost identical language which begins:

"Certificates, permits, and licenses shall be effective from the date specified therein, and shall remain in effect until suspended or terminated as herein provided."

A transfer under section 5(2) differs from the acquisition of a certificate by original proceedings with respect to not only the standards applied but also the obligations involved. Inevitably there are employees of the purchased carrier who must be dealt with in accordance with the Commission's order of approval of the transfer; the treatment of these employees undoubtedly represents a significant practical and financial element in choosing this method of acquiring a certificate and completing the transfer. It is, in effect, one element in the investment in the new routes. Here, the Commission, by adding the severance pay provisions, has retroactively increased the cost of investment, a cost which if known at the time the transfer was being considered by the parties might have altered their business judgment on the feasibility of the transfer, just as Delta Air Lines may no longer have wished the new routes after learning of their summary curtailment by the Commission in the Delta Air Lines case. In my opinion the addition of these new labor protective provisions alters the conditions upon which Baggett may obtain and retain its certificate, bringing the change within the ambit of section 312(a). Nor should the fact that the certificate is acquired by transfer rather than original proceedings in any way weaken Baggett's route security. To the acquiring party, the acquisition by transfer rather than original proceeding is of little moment once operations have begun. The reliance on the certificate, the investment in the acquired and perhaps new equipment, development of routes, obligations of a functioning carrier to the ICC, and so forth, are identical in both cases. I therefore feel that neither section 5(2) nor 5(9) should be interpreted to weaken the strictures of section 312(a).

Further, I believe the majority incorrectly implies that Delta Air Lines requires only notice and a hearing when a certificate change is involved, rather than a proceeding in accord with section 312 (a). For the Court in Delta Air Lines

stated repeatedly with respect to the counterpart of section 312(a) in the Federal Aviation Act:

"And there is no other explanation but that Congress delimited the Board's power to reconsider its awards with precisely this factor in mind [route security]; hence the language that a certificate *shall be effective* * * * until suspended or revoked as hereinafter provided' * * *." 367 U.S. at 324, 81 S.Ct. at 1618.

"But, we feel that we would be paying less than adequate deference to the intent of Congress were we not to hold that, after a certificate has gone into effect, the instructions set out in the statute are to be followed scrupulously." 367 U.S. at 325, 81 S.Ct. 1618.

"All we hold is that, if the Board wishes to do so [modify a certificate], it must proceed in the manner authorized by statute. Thus, for example, the Board may reconsider an effective certificate at any time if it affords the certificated carrier notice and hearing prior to decision * *." 367 U.S. at 329, 81 S.Ct. at 1621.

This clearly contemplates a notice and a hearing pursuant to the relevant statutory provisions, section 312(a) in this case. Since the majority does not even imply that their "good cause shown" would satisfy the criteria for modifying a certificate as set out in section 312(a),

I find their grounds insufficient to support the decision.

The majority also indicates that the differing provisions of the Motor Carrier Act, in particular 49 U.S.C.A. § 308, makes the strict rule of Delta Air Lines inapplicable, and quotes the manner in which the Court in Delta Air Lines distinguished the case of United States v. Rock Island Motor Transp. Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951):

"However, two important distinctions between that case and this are apparent: (1) The Motor Carrier Act makes express provision for summary modifications after certification, 49 U.S.C. § 308.—and (2) the Court in Rock Island was very careful to limit its holding to the particular modification made in that case."

The very careful limitations of Rock Island, however, are worthy of further note. The Court specially emphasized that the modification which the Commission there made to an outstanding certificate was pursuant to an express reservation in the certificate providing for such a modification. The modification was also one which was necessary to insure that the original purpose of the certificate would continue to be carried out. Although the court made note of section 308, 340 U.S. at 435, 71 S.Ct. 382, it was of the clear opinion that only the express reservation kept the Commission from violating section 312(a).[1] The dis-

---

[1] " * * * Such a reservation, of course, does not provide unfettered power in the Commission to change the certificate at will. That would violate § 212, allowing suspension, change or revocation only for the certificate holders' willful failure to comply with the Act or lawful orders or regulations of the Commission. The reservation by its terms does not offend against the provision of § 212 that a certificate 'shall remain in effect until suspended or terminated,' as § 212 provides. The Commission asserts the modifications were made in accordance with the certificate. The reservation would not authorize changes in operation or service unconnected with the plan of coordinated operation; and indeed Transit was not orig-

inally authorized to operate independently and at large. What the reservation does allow are changes to insure that the operations will continue as auxiliary or supplemental to the train service.
* * * * *
" * * * We turn then to the question whether the five directed modifications of the certificate, [340 U.S. at] pp. 425–426, [71 S.Ct. at pages 386, 387,] supra, fairly may be said to be of a character auxiliary to or supplemental of train service and not such a change or revocation in part as is contemplated by the procedure of § 212, for failure to comply with statutory or regulatory provisions." 340 U.S. at 435, 436, 71 S.Ct. at 391.

senting Justices were of the opinion that the modifications were a partial revocation of the certificate in a manner not authorized by the statute (340 U.S. 449, 71 S.Ct. 382). If section 308 were authority for the modification there would have been no need for the special emphasis on the reservation or for the dissent. There is no reservation in the certificate or order in this case to provide for the protection of Hunt's employees, and § 308 is not authority, in my mind, for reopening the original proceedings to attach new conditions.

Nor am I persuaded by the Government's attempt to escape the Court's holding in Delta Air Lines. It argues that the certificate in this case was inadvertently issued while a petition for reconsideration was still pending before the Commission and that under the case of American Trucking Association v. Frisco Co., 1958, 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172, an outstanding certificate may be modified for the correction of inadvertent errors. The Government's argument, however, is misplaced. The American Trucking case held that where a restrictive condition had been omitted from the certificate as a result of a clerical and ministerial error on the part of the Commission's staff, the error could be corrected. The error went not to the time of issuance, but to the content. The argument here is not that a protective labor provision carefully spelled out in the Commission's report and order was omitted from the certificate issued August 30, 1957 as the result of a clerical error, but that the issuance itself, before the Commission passed on a petition for reconsideration on the merits, was an inadvertent error. The way to correct the error was not to consider the petition while the certificate was outstanding but to withdraw the inadvertently issued certificate. For example, if the Court of Appeals inadvertently issued a mandate while a valid petition for rehearing was still pending before it, the proper procedure would be to withdraw the mandate, entertain the rehearing, and then issue a valid mandate after conclusion of the rehearing. It clearly could not entertain the rehearing while the inadvertently issued mandate was outstanding and being relied upon by the parties and the court below. Thus the mere fact of inadvertent issuance of the certificate would not suspend the strict rule of Civil Aeronautics Board v. Delta Air Lines, Inc., and permit the Commission to add new conditions years later after hearing the petition for reconsideration.

This does not necessitate a reversal, however. For the Commission was very emphatic in its belief that Baggett had made serious misrepresentations to the Commission with respect to its intention to absorb Hunt's employees. The majority finds that there is no evidence in the record to support this charge; however, I am convinced that the Commission was justified in its conclusion and that this will provide the basis for altering Baggett's certificate.

In my opinion, the Commission could validly conclude that Baggett's complete failure to make bona fide offers of employment to Hunt's employees in accordance with the verified representations of its application was an intentional failure to comply. The only question is whether this intentional failure amounts to legal misrepresentation. Baggett argues that, to prove the original representations fraudulent, the Commission must find that Baggett did not intend to live up to them at the time they were originally made—a finding which would find no support in the record. The crux of the Commission's theory of misrepresentation, however, does not turn on Baggett's intent at the time of filing; the Commission's primary concern is found in its conclusion that "it was Baggett's responsibility to come to the Commission and disclose its inability to carry out its representations and ask for appropriate relief rather than to adopt a device designed to evade obligations thereunder." While Baggett might consider this ruling arbitrary, it follows as a matter of course from the type of proceedings we are dealing with and has been inferred in numer-

ous similar circumstances. For example, it has long been the rule in many jurisdictions that insurance policies are voidable at the option of the insurance company when the insured conceals or fails to disclose a material change in facts affecting the risk, which change takes place between the time of the application and the delivery of the policy. See Stipcich v. Metropolitan Life Ins. Co., 1928, 277 U.S. 311, 316–317, 48 S. Ct. 512, 72 L.Ed. 895; Government Employees Ins. Co. v. Powell, 2 Cir., 1947, 160 F.2d 89; Cohen, Friedlander & Martin Co. v. Massachusetts Mut. Life Ins. Co., 6 Cir., 1948, 166 F.2d 63. A similar rule has been laid down with respect to transfers dealing with interests in land. In Hush v. Reaugh, D.C.1938, 23 F.Supp. 646, 652, the court said:

> " * * * for if one has made a statement which was true when made and material change takes place in financial condition, in value or in health, he is guilty of fraud in not disclosing such change when he knows or should know that the other party relies on such original representation. * * * Piedmont & Arlington Life Ins. Co. v. Ewing, 92 U.S. 377, 23 L.Ed. 610 * * *."

The rationale of this rule is clearly applicable to the present case. The Commission must be able to rely upon the representations of the parties not only at the time they are made, but at the time that final approval of the transaction is granted. In different words, when representations made to the Commission speak to the nature of the transaction to be approved, they are continuing ones up until the termination of the proceeding. I am therefore of the opinion that the Commission applied the correct rule of law in reaching its conclusion that Baggett had been guilty of misrepresentation.

While fraud is not mentioned in section 312(a) as a ground for altering a certificate, other sections in the statute and the nature of Baggett's conduct justify the action taken by the Commission.

In finding the source of statutory power allowing the Commission to correct clerical errors in American Trucking Association v. Frisco Co., supra, the Court relied upon section 17(3) of the Interstate Commerce Act, 49 U.S.C.A. § 17(3), which provides:

> "The commission shall conduct its proceedings under any provision of law in such manner as will best conduce to the proper dispatch of business and to the ends of justice."

It pointed out that "it is axiomatic that courts have the power and the duty to correct judgments which contain clerical errors or judgments which have been issued due to inadvertence or mistake," 358 U.S. at 145, 79 S.Ct. at 177; it then cited Rule 60 of the Federal Rules of Civil Procedure, 28 U.S.C.A., to this effect and held that the Commission also must have such a basic power to "best conduce the ends of justice." The power to correct fraud is similarly axiomatic and basic to all courts and to a tribunal exercising judicial functions as does the Interstate Commerce Commission. Under such circumstances such rules as the finality of a proceeding or judgment must be put aside to protect the integrity of the judicial process. As the Court said in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250, in allowing the reopening of a judgment after 12 years for the determination of fraudulent procurement,

> " * * * tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. * * * The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

This power and duty to reopen a judgment so obtained is granted to the courts of the United States in Rule 60(b) of the Federal Rules of Civil Procedure— the same rule cited by the Court in American Trucking, supra. I am therefore of the opinion that for the same reasons cited by the Court there, the Commission has the statutory power to correct fraud in its orders and certificates as well as clerical errors—it is a necessary power "best to conduce the ends of justice."

Whether this power should be exercised in the manner adopted here, however, is still an open question since, in addition to the normal policy of finality, Congress has expressed a special interest in the certificated "route-security" of the carriers. It is quickly apparent, however, that the carrier-defendant is in no position to assert his route-security under a certificate when the route or any of the conditions of its use were obtained as the result of its own misrepresentation. Baggett argues that had it known of the protective provisions prior to the completion of its transaction with Hunt, it might not have gone through with the transfer. However, when Baggett made its application for the transfer with the representations contained in that application, it became bound to them. Since the provisions added by the Commission do no more than correct the deviation from these representations, Baggett is in fact saying that had it known it would have to live up to its own representations, it never would have filed the application in the first place. Such a decision is one it should have made before filing. The carrier is entitled to the protection of its routes only to the extent that their certification was properly and legally obtained.

I am therefore of the opinion that the Commission followed a valid procedure in adding the labor protective conditions in this case, especially where a petition for reconsideration was filed prior to the issuance of the certificate and immediately after the discovery of the misrepresentation.[2] There is no indication that the Commission has attempted to assert an affirmative power beyond its existing statutory powers in correcting Baggett's misrepresentation—the labor protective provision is both standard and clearly envisioned by the statute. Such due process requirements as notice and hearing were carefully observed. If Baggett now refuses to obey the amended order, the Commission can institute revocation proceedings under section 212(a) of the Interstate Commerce Act, 49 U.S. C.A. § 312(a).

---

2. I have found no federal cases directly in point, but a number of state courts have followed the same basic analysis in holding that state administrative agencies have the power to reopen and modify their determinations to correct for fraud.

See Miles v. McKinney, 174 Md. 551, 199 A. 540, 117 A.L.R. 207; Industrial Commission of Ohio v. Dell, 104 Ohio St. 389, 135 N.E. 669; Annot., 73 A.L.R.2d 939, 951–52; 42 Am.Jur., Public Administrative Law, § 174.