ERIE–LACKAWANNA RAILROAD
COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission,
Defendants.

The BALTIMORE AND OHIO RAILROAD COMPANY, the Chesapeake and Ohio Railway Company, Norfolk and Western Railway Company, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

The CENTRAL RAILROAD COMPANY OF NEW JERSEY and Reading Company, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Nos. 66 Civ. 2860, 66 Civ. 2903, 66 Civ. 2914.

United States District Court
S. D. New York.

Oct. 4, 1966.

Appeal Dismissed in Part
Dec. 29, 1966.

See 87 S.Ct. 612.

Edward W. Bourne, J. Kenneth Campbell and John T. Rafferty, New York City (Alexander & Green, New York City), for plaintiff Erie-Lackawanna Railroad Co.

Howard J. Trienens, Chicago, Ill., and Edward K. Wheeler, Washington, D. C. (Kelley, Drye, Newhall, Maginnes & Warren, New York City), for plaintiffs Baltimore and Ohio Railroad Co., The Chesapeake and Ohio Railway Co., and Norfolk and Western Railway Co.

William P. Quinn (Thomas E. Tisza, New York City), for plaintiffs Central Railroad Co. of New Jersey and Reading Co.

Harry G. Silleck, Jr., New York City (Nixon, Mudge, Rose, Guthrie & Alexander, New York City), for intervening plaintiff Delaware & Hudson Railroad Corp.

Francis P. Bensel, New York City and James H. Durkin, Chicago Heights, Ill. (Martin, Clearwater & Bell, New York City), for intervening plaintiff Chicago & Eastern Illinois Railroad Co.

Norman C. Melvin, Baltimore, Md. (Thomas E. Tisza, New York City), for intervening plaintiff Western Maryland Railway Co.

Edward A. McDermott, Francis Casey, Jr., Washington, D. C., and Richard C. Casey, Washington, D. C. (Hogan & Hortison, Washington, D. C.), for intervening plaintiff Boston & Maine Railroad Co.

Gordon P. MacDougall, Washington, D. C. (Arthur Arsham, New York City), for intervening plaintiff Milton J. Shapp.

Arthur Arsham, New York City, for intervening plaintiffs Borough of Freedom and City of Scranton.

Robert M. Morgenthau, U. S. Atty., for the S. D. of New York, for defendant, the United States.

Robert W. Ginnane, Gen. Counsel, for defendant, the Interstate Commerce Commission.

Edward F. Butler, New York City, Windsor F. Cousins and Richard R. Bon-

gartz, Philadelphia, Pa. (Conboy, Hewitt, O'Brief & Boardman, New York City), for intervening defendant Pennsylvania Railroad Co.

James B. Gray and Jerome H. Shapiro, New York City (Gerald E. Dwyer, New York City), for intervening defendant New York Central Railroad Co.

Joseph Auerbach, Arthur Blasberg, Jr., Robert G. Bleakney, Jr., Boston, Mass., Robert M. Peet, New York City, James Wm. Moore, and Robert W. Blanchette, New Haven, Conn. (Sullivan & Worcester, Boston, Mass.), for intervening defendants Richard Joyce Smith and William J. Kirk, as Trustees for New York, New Haven & Hartford Railroad Co.

David Berman, Asst. Atty. Gen. (Edward Brooke, Atty. Gen), for the Commonwealth of Massachusetts, intervening defendant.

J. Lee Rankin, Corp. Counsel, for intervenor City of New York, by Norman Redlich and Samuel Mandell.

Walter J. Myskowski (Asst. Atty. Gen., Charles A. LaTorella, Jr.), for intervening defendant, State of New York.

Herbert Smolen, Philadelphia, Pa. (Edward G. Bauer, Jr., City Sol.), for intervening defendant, the City of Philadelphia.

Donald L. Wallace, New York City (Clark, Carr & Ellis, New York City), for intervening defendants Chambers of Commerce of Greater Philadelphia & Pittsburgh.

Robert M. Schacht, Asst. Atty. Gen. (J. Joseph Nugent, Atty. Gen.), for intervening defendant, the State of Rhode Island.

Samuel Kanell, Sp. Asst. Atty. Gen. (Harold M. Mulvey, Atty. Gen.), for intervening defendant, the State of Connecticut.

Howard Lionel Toft, Newark, N. J., for intervening defendant, the City of Jersey City.

Before FRIENDLY, Circuit Judge, and WEINFELD and LEVET, District Judges.

FRIENDLY, Circuit Judge:

These are motions for a temporary injunction in three consolidated actions wherein various plaintiffs and intervenors seek to enjoin orders of the Interstate Commerce Commission authorizing the merger of the New York Central Railroad Company (NYC) with the Pennsylvania Railroad Company (PRR) [the proposed merged company being hereafter referred to as the Transportation Company] and the issuance of securities and assumption of obligations by PRR in accordance with numerous conditions therein set forth and others that may later be imposed. The orders were to become effective on September 30, 1966.

On September 21 we heard argument on the motions, granted leave until September 27 to file additional briefs addressed to new issues raised by the Commission's report on reconsideration served September 19, and because of the impracticability of concluding our deliberations and preparing an opinion before September 29 under the circumstances, entered an order temporarily restraining consummation of the merger pending further order of this court. We have concluded that a temporary injunction should be denied.

The proceedings before the Commission, F.D. 21989 and 21990, were initiated by applications filed March 9, 1962. After extensive hearings, the examiners rendered a recommended report and order on March 29, 1965. In a document of 446 pages with many appendices, they advised the Commission to find the transactions consistent with the public interest, 49 U.S.C. §§ 5(2) (b) and 20a (2), subject to numerous conditions primarily for the protection of other carriers and of labor. In a report dated April 6 and served April 27, 1966, which fully complied with the directions of the Supreme Court in such recent decisions as Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 186, 80 S. Ct. 229, 4 L.Ed.2d 223 (1959), and Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d

223 (1965), the Commission accepted their ultimate recommendation but with conditions differing in several respects.

The Commission's report attracted many petitions for reconsideration. Only one, by Milton J. Shapp, an industrialist and PRR stockholder, questioned the desirability of the merger. The petitions went rather to its consummation before certain other merger or control proceedings had been finally determined; to the sufficiency of special protective traffic and financial provisions fashioned by the Commission for the benefit of Erie-Lackawanna (E–L), Delaware & Hudson (D & H) and Boston & Maine (B & M); to the lack of similar or other provisions in favor of other carriers; and to a fear that the financial provisions for the protection of E–L, D & H and B & M might lead to manipulation of traffic favorable to the Transportation Company or the protected lines and adverse to others. Complaint was made also that the novel protective provisions had been imposed without the hearing required by § 5(2) (b) of the Interstate Commerce Act, § 5 of the APA and the due process clause of the Fifth Amendment, and that the financial provisions constituted a pooling arrangement under § 5(1) of the Interstate Commerce Act.

In order to consider these petitions the Commission deferred the effective date of the merger from May 31 to September 30, 1966, but, on August 29, declined to postpone this further although its report on reconsideration had not yet been filed. E–L thereupon brought an action to enjoin the merger; and two other actions were brought and later consolidated, one by the Baltimore & Ohio (B & O), Chesapeake & Ohio (C & O), and Norfolk & Western (N & W), the other by the Central of New Jersey (CNJ) and the Reading. D & H and B & M, also beneficiaries of the special protective conditions, intervened as plaintiffs in E–L's action; two other railroads, the Chicago & Eastern Illinois (C. & E. I.) and Western Maryland (WM), intervened in the others. Shapp and the Borough of Freedom and City of Scranton also intervened as plaintiffs. PRR, NYC and the Trustees of the New Haven (NH) intervened as defendants. Numerous public bodies and chambers of commerce also intervened as defendants.

We interrupt the narrative at this point to describe the special protective conditions in favor of E–L, D & H and B & M and the background for them.

Transportation Act, 1920, which in returning the railroads to private management placed them "more completely than ever under the fostering guardianship and control of the Commission", Dayton-Goose Creek Ry. v. United States, 263 U.S. 456, 478, 44 S.Ct. 169, 172, 68 L.Ed. 388, 33 A.L.R. 472 (1924), directed the Commission to "prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems"; once the plan was adopted, all consolidations must be in harmony therewith. 41 Stat. 481 (1920). Despite the expenditure of vast amounts of time and effort, nothing came of this grand design, and the provision was later eliminated. Congress has "consistently and insistently denied the Interstate Commerce Commission the power to take the initiative in getting one railroad to turn over its properties to another railroad in return for assorted securities of the latter." St. Joe Paper Co. v. Atlantic Coast Line R.R., 347 U.S. 298, 305, 74 S.Ct. 574, 579, 98 L.Ed. 710 (1954). Railroad consolidation has thus proceeded on a voluntary case by case basis and, until recently, with less than even deliberate speed. However, the intensified competition from other forms of transportation after World War II gave a new impetus to railroad consolidation, and the Commission has freely utilized its power under § 5(2) (d) to insist that carriers avid for matrimony should adopt some disfavored children.

This process has already resulted in a considerable realignment of the railroads serving the northeastern states. We here refer only to the two most important of these steps, the control of the B & O by the C & O authorized in 1962,

317 I.C.C. 261, and the acquisition, in one form or another, of the Nickel Plate, Wabash, Pittsburgh & West Virginia, and Akron, Canton and Youngstown by the N & W authorized in 1964, 324 I.C.C. 1.[1] There remained the two large roads which have sought to merge in these proceedings and several smaller ones.

The most important smaller independent lines in the northeastern states are NH, for some years in a proceeding under § 77 of the Bankruptcy Act, E–L, D & H and B & M.[2] The Commission's order binds the Transportation Company to take over the operations of NH on terms to be agreed or, in the absence of agreement, to be fixed by the Commission, all subject to approval by the bankruptcy court, 327 I.C.C. 553.[3] This provision has the enthusiastic support of the Trustees of the NH and of the four states, New York, Connecticut, Rhode Island and Massachusetts, which it serves. E–L had initially asked to be included in the proposed unification of the N & W and other lines and opposed that transaction if not so included; however, in October 1961, having entered into an agreement with the Nickel Plate for joint construction of an electronic classification yard at East Buffalo, N. Y., and for good faith negotiation for affiliation with the new system, it withdrew its application for compulsory inclusion and supported the N & W merger without such a provision. 324 I.C.C. 19–20. D & H and B & M had likewise petitioned for inclusion, but the withdrawal of E–L's petition eliminated what would have been the only physical connection between them and the N & W system. 324 I.C.C. 29–31. The Commission therefore did not require immediate inclusion of the three roads in the N & W system but prudently retained jurisdiction for a period of five years to entertain applications for such inclusion and, if this was found consistent with the public interest, to prescribe equitable terms; consummation of the approved transactions was to constitute "acquiescence in and irrevocable assent" to this condition by the N & W. 324 I.C.C. 148. We are advised that such applications have been filed and hearings completed.

The Commission denied a request of E–L, D & H and B & M for mandatory inclusion in the Transportation Company, except in the event of an adverse determination by it with respect to their absorption by N & W. 327 I.C.C. 530–31, 553. It found, however, "that when the various consolidations of yards and equipment and the new through routes contemplated by the applicants are effectuated, a substantial amount of traffic could be diverted from E–L, D & H, and B & M," and that "it is doubtful that, without inclusion in a major system, these three carriers could withstand the competition of the applicants merged"; hence, "unless they are protected during the period necessary to determine their future, we would not authorize consummation at this time, even though approving the merger." 327 I.C.C. 531–32. To that end the Commission imposed conditions on "approval of the merger for undelayed consummation," which were "designed to prevent any loss of revenue over the three railroads as a direct result of immediate consummation of this merger," such conditions to be applicable pending final determination of the petitions for inclusion of the three carriers in a major

<hr>

1. The N & W had absorbed the Virginian Railway in 1959. 307 I.C.C. 401.

2. PRR and NYC characterize two other lines, CNJ and the Reading, as B & O "family lines." B & O owns some 38% of the voting stock of Reading, and Reading owns some 49% and C & O 2% of the voting stock of CNJ.

 The Commission required, as a condition of the instant merger, that the Transportation Company negotiate in good faith for the inclusion of the Lehigh Valley in the C & O or, if the Commission should not find this to be in the public interest, in the N & W, and in the event of inability to agree on terms to accept the Commission's determination. 327 I.C.C. 554–55.

3. The Transportation Company is also required to include the New York, Susquehanna & Western. 327 I.C.C. 552.

system or such other period as the Commission may prescribe, "the protective period." [4] These conditions, unprecedented in their severity in the history of railroad mergers, provided for "(1) the temporary preservation of present practices and patterns (as to both routes of movement and volume) on traffic for which E–L, D & H and B & M compete with applicants and other railroads making up the proposed system; (2) the payment of an indemnity by the Transportation Company to E–L, D & H and/or B & M whenever, in a given year, the revenues of E–L, D & H and B & M are, as to each of them, proportionally less than the combined revenues of each protected carrier and the Transportation Company, as computed on the basis of the relationship existing between such revenues for the year 1964; and (3) procedures for the determination of questions arising under" the two sets of conditions, hereafter referred to as "the traffic conditions" and "the financial conditions" or "the indemnity." 327 I.C.C. 532–33. Some further explanation of the method for calculating the indemnity may be helpful. The first step is to obtain a "base revenue ratio" by dividing the protected carrier's freight revenues for 1964 by the sum of the revenues of that carrier, PRR and NYC for that year. The freight revenues of the Transportation Company and the protected carrier for a future year would then be totalled and multiplied by the base revenue ratio to arrive at what the protected carrier's revenues hypothetically would have been but for the merger, the "standard revenue." Subtraction from this of the actual freight revenues of the protected carrier for the year in question, the "earned revenue," produces the "indemnification base." The final step is to multiply the indemnification base by the difference between 100% and the protected carrier's average freight operating ratio for 1962–65. 327 I.C.C. 533–34. In the event of failure by applicants to accede to these special traffic and financial provisions, consummation of the merger was to be deferred for two years or such time as the Commission may determine to be necessary to protect the interests of the three carriers. 327 I.C.C. 563.

In sharp contrast to most actions to enjoin orders of the Commission approving railroad mergers, none of the carriers who are plaintiffs or intervenors and almost none of the other intervenors question the ultimate desirability of the merger. Rather the complaints and motions for a temporary injunction raised substantially the same objections as had been presented to the Commission in petitions for reconsideration. Consummation of the merger on any terms prior to a definitive solution of the future of the

4. The Commission evidently thought the protective period would not be of long duration, and the lapse of time since April, 1966, has made this shorter still. Although the Commission's duty to avoid prejudgment prevented its saying so, no great clairvoyance is needed to predict the likelihood of its finding that the public interest is consistent with inclusion of the three roads on proper conditions in the N & W system—an affiliation which they prefer and which will promote competition between the N & W and the Transportation Company. With the hearings on inclusion in the N & W already ended, a final determination in 1967 should surely be feasible; and the Commission has power to fix terms binding on N & W. While we do not pass on the extensive recriminations exchanged by the various roads, including the claim of PRR and NYC that the recent departure of N & W and C & O-B & O from the benevolent neutrality toward the merger displayed at the hearings is related to their new desire to achieve a two-system rather than a three-system plan in the northeast, it is rather obvious that if N & W and the protected roads were to cooperate in arriving on terms by which N & W can fulfill its obligations, the protective period would be quite short. The State of New York, which is served by all three protected lines as well as by the proposed merged carrier, argues with some plausibility that consummation of the merger would act as a spur to bringing these roads and the N & W together on a basis fair to all; the Commission could well have had that in mind when authorizing immediate consummation.

protected roads was claimed to be contrary to the public interest both by the protected carriers and by other lines. The protected carriers assailed the traffic and financial conditions as vague and insufficient in respects too numerous to mention. Other roads claimed entitlement to similar or other protection. Both these latter roads and B & O, C & O and N & W contended that the indemnity provisions had introduced a new element making the merger more detrimental to them in the protective period than theretofore supposed. The contention was that these provisions created a "community of interest" between the protected roads and the Transportation Company whose impact the Commission had failed to appreciate. The indemnity formula, it was alleged, would give the protected carriers an abnormal incentive to throw interline traffic to the Transportation Company rather than to its competitors in order to increase the figure used in computing the "standard revenue" of the protected carrier for a future year, and would give the Transportation Company a similar abnormal incentive to throw interline traffic to the protected carriers rather than to others in order to increase the formers' "earned revenue." The indemnity was also contended by the unprotected carriers to be a pooling arrangement ordered without the hearing and findings required by § 5(1) of the Interstate Commerce Act. Particular emphasis was placed, both in this connection and otherwise, on the lack of proper opportunity to be heard. PRR and NYC countered, among other things, with affidavits alleging that the estimates of the diversionary effects of the indemnity formula on other carriers ignored the realities of life. They pointed to the large proportion of the traffic routed by the shipper, estimated to be 85% of the total, which he directs in his own interest regardless of the desires of any carrier; to the fact that if the carriers had the influence alleged by the unprotected roads, they would use it to cause much of the traffic cited to move over their own lines rather than over any other; to the time required to change established routing practices; and to what they considered the unlikelihood of the three protected roads' temporarily diverting interline traffic to the Transportation Company, which was likely to be their principal future competitor, in preference to the N & W or other lines.

The Commission's report on reconsideration, served September 19, 1966, put the controversy with respect to the special protective conditions in favor of E–L, D & H and B & M in a new posture, at the same time that it rejected almost all the contentions raised by the petitions concerning other phases of its initial report.[5] The Commission reopened the proceedings for further consideration, with limited further hearing, to determine in what respects the protective traffic and financial conditions should be modified, including modification to prevent "manipulations" of the financial conditions of the nature described above, and also whether a provision should be included to compensate the protected carriers from a loss in capital values arising from diversion of revenues not met by indemnity provisions. N & W, which had not theretofore intervened, was granted leave to participate in these further hearings. Consummation of the merger was permitted to proceed on September 30, 1966, but this would "constitute irrevocable assent on the part of the applicants to any modification resulting from the further consideration herein described and ordered and which are found to be just.

5. The Commission modified a finding of the examiners, pp. 301–05, that C & O, B & O, CNJ and Reading would not be adversely affected, which it had previously adopted, so as to find only "it has not been shown of record that the merger will be detrimental to C & O-B & O, CNJ, or Reading individually or to their ability to provide a general transportation service to the public." It also modified the provision for possible ultimate inclusion of the protected roads in the Transportation Company so as to eliminate any need for the Company's joining in the request for inclusion.

and reasonable; as well as irrevocable agreement by the applicants to comply fully with the conditions as modified" save only that "it should be clearly understood that the consummation of the merger will not foreclose or limit court review of any decision the Commission may make in regard to the capital indemnity issue." Pending reconsideration the special traffic conditions stated in the initial report were to remain in effect but the indemnity provisions were rescinded; modified protective provisions would be effective "as of the date prescribed in a modification order" except that any provision decided upon for the payment of indemnities would be retroactive to the date of consummation. Since the report on reconsideration thus answered many of the complaints of the carriers who were plaintiffs or intervening plaintiffs but created new issues, we were impelled, as indicated, to grant leave for the filing of further briefs and to enter a temporary restraining order.

 The magnitude and importance of this proceeding do not mean that a temporary injunction should issue as a matter of course; in great cases as in small the issuance of such an injunction rests in sound judicial discretion. Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). We see no basis for the notion, apparently entertained by certain plaintiffs, that all railroad mergers should be temporarily enjoined on the mere request of other carriers; rather the fact that such mergers come to a court with the imprimature of the "tribunal appointed by law and informed by experience," Illinois Central R. R. v. I. C. C., 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128 (1907), in this instance unanimous, and the consequent limitations on judicial power place a greater burden on those seeking interlocutory relief than when no administrative screening has occurred. The history of other proceedings to enjoin commission approved mergers with delays of many years, which has been cited as a worthy example for us to follow, seems rather to indicate the need of circumspection before granting injunctive relief—particularly in a case such as this where there is general agreement that the merger should occur. It is just as important that a court should not subject a valid railroad merger to unnecessary delay as that it should permanently enjoin one that does not conform to statutory standards or temporarily enjoin one as to whose validity there are truly serious doubts which it needs time to resolve. We accept as a correct formulation of the standards governing the exercise of our discretion the frequently cited statement of the Court of Appeals of the District of Columbia in Virginia Petroleum Jobbers Ass'n v. F. P. C., 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), which was approved by the Court of Appeals for this Circuit in Eastern Air Lines, Inc. v. C. A. B., 2 Cir., 261 F.2d 830 (1958).[6] The courts there listed four factors to be considered in determining whether to stay the order of an administrative agency pending full review:

(1) Whether the petitioner has made "a strong showing that it is likely to prevail on the merits";

(2) Whether the petitioner has shown that without interim relief it will have been irreparably injured if it ultimately prevails;

(3) Whether the issuance of a stay would substantially harm the parties opposing it if they ultimately prevail; and

(4) Whether the public interest will have been adversely affected by a stay

**6.** Breswick & Co. v. United States, 134 F. Supp. 132, 149 (S.D.N.Y.1955), cited by our dissenting brother as suggesting a less rigorous standard, is rather another object-lesson as to the caution that ought to be exercised in enjoining administrative action. For the further history see 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957), reversing and remanding; 156 F. Supp. 227 (S.D.N.Y.1957), again issuing an injunction; 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374 (1958), summarily reversing and remanding; 160 F.Supp. 754 (S. D.N.Y.1958), dismissing the complaint.

if the validity of the order is ultimately sustained.

We can narrow the field of real controversy rather quickly. The complaints of Shapp and the Borough of Freedom and City of Scranton, the only parties attacking the merger as such, afford no warrant for a temporary injunction, since they fail on all the points listed. We likewise can discern no likelihood of success on the merits in the claims that consummation of the merger should be deferred until conclusion of all pending rail merger proceedings relating to the northeastern United States, including a new and controversial one in which C & O and B & O now seek to be included in the N & W system, see fn. 4. We do not here need to rely on contentions that the argument comes with ill grace from B & O–C & O and N & W, which have already had all the cake they initially sought, or from E–L, whose 1961 withdrawal of its petition for inclusion in N & W is responsible in considerable measure for the present predicament of itself, D & H and B & M. Decision whether to handle all these consolidations in one giant proceeding or in several rests in the sound judgment of the Commission subject only to its management of the various proceedings so as to promote an ultimate solution fair to the carriers and consistent with the public interest, a task in which it has displayed considerable ingenuity. We also see no prospect that C. & E. I. or any other nonprotected carrier would be able to persuade a reviewing court to set aside for lack of substantial evidence the findings of failure to show serious diversion arising from the merger itself, as distinguished from the new problems allegedly engendered by the indemnity formula which are yet to be ruled upon.[7] The

points requiring discussion are those raised in regard to the protective conditions, both by their beneficiaries and by other carriers. Moreover, although the precise issue as to these is whether we should grant an injunction until final hearing of these actions, the question that would be faced at that time would be whether to grant one pending the Commission's decision on reconsideration, and we would know little more than we do now, unless we were to conduct a trial at which evidence would be taken on the claims with respect to the protective conditions now made in affidavits. That would be the very evidence which the Commission will be taking on its reconsideration, and, apart from the wasteful duplication of effort, we would scarcely wish to anticipate its conclusion in a field requiring technical knowledge and largely confided by Congress to its expert judgment. The case thus differs sharply from the usual motion for a temporary injunction against enforcement of a commission order in that the most important issues do not require detailed study of the administrative record but are questions of law which can be decided quite as well on preliminary as on final hearing. Compare Trans World Airlines v. C. A. B., 184 F.2d 66, 71–72 (2 Cir. 1950), cert. denied sub nom. Sparks v. C. A. B., 340 U.S. 941–942, 71 S.Ct. 504, 95 L.Ed. 679 (1951).

The third and fourth factors cited as governing the exercise of our discretion, damage to the defendants and to the public, weigh heavily against the grant of a temporary injunction, although perhaps not quite so overwhelmingly as the defendants assert. The Commission found, with ample supporting evidence, "that the transaction will permit more economical and efficient use of the ap-

---

7. Although, as noted in the report on reconsideration, CNJ made no appearance during the hearings and Reading made no showing of adverse effect, the Examiners carefully considered the question and found an absence of adverse effect. Pp. 301–05. The Examiners also made thorough and well documented findings, adopted by the Commission, as to lack of serious effect on the C. & E. I., pp. 310–21. They further found that an agreement between WM, PRR and the Pittsburgh & Lake Erie (presently controlled by NYC) adequately protected WM and the territory served by it, pp. 306–09; the Commission imposed a number of conditions in this regard, Appendix H, 327 I.C.C. 563–64.

plicants' transportation facilities" and that the resulting economies "will redound in large part to the benefit of shippers, and thus to the general public, either through the improved service thereby made possible or lower rates." 327 I.C.C. 491. These considerations do not lose their force because of the marked recent improvement in the applicants' earnings. By adding financial strength and eliminating the need for duplicate facilities, the merger will promote renovation of plant needed to enable the applicants to afford better service and thereby retain or increase traffic. Granted that the maximum $80,-000,000 annual savings estimated by the applicants and found by the Commission to be attainable by the merger are not expected until the eighth year, when physical improvements will have been completed and the expense of the labor protective provisions attenuated, substantial savings are estimated at earlier dates, and any postponement of consummation will postpone for the same period all the savings and the improved service for the shipping public.

We do not suggest the country will perish if these roads, which have lived apart for more than a century, and even for four and a half years since their engagement, must continue to do so pending Commission reconsideration and judicial review. But what is in the public interest eventually is in it now unless there are truly significant considerations on the other side. No suggestion has been or practically could be made by the plaintiffs of willingness to post a bond to indemnify PRR and NYC against loss from what may prove to be an unjustified postponement of the anticipated savings; indeed, it might be contrary to the public interest for carriers complaining of weakness to make such a use of their resources. Moreover, even if posting a bond were practicable, it would not protect the shipping public from loss through the deferment of improved service. The long delay to which the applicants have already been subjected argues strongly in favor of letting them get ahead with the job, as the Commission unanimously thought, rather than against it.

Before leaving these two factors we should say a word as to the contention, heavily pressed upon us, concerning the adverse effect upon the New Haven of a temporary injunction against consummation. There is no dispute that the provision compelling inclusion of this property, vitally needed but lacking vitality, is strongly in the public interest. The Trustees of NH are planning to move promptly with a two-step plan, first for the inclusion of NH in the Transportation Company under § 5(2) of the Interstate Commerce Act, and then for its reorganization under § 77 of the Bankruptcy Act. Their aim is to accomplish inclusion as speedily as possible, deferring questions as to allocation of the proceeds among NH's creditors. If a temporary injunction would imperil or even seriously delay NH's inclusion, this would indeed weigh most heavily against it. We find no likelihood of a delay. Under the Commission's order the parties are obliged to negotiate with Reading, CNJ and WM "concerning the amount of traffic of those railroads subject to diversion by reason of the inclusion [of NH] and as to any conditions necessary to protect existing routes and gateways"; if no agreement can be reached, the Commission will prescribe conditions. 327 I.C.C. 553. It is unrealistic to suppose that inclusion of NH in the Transportation Company can be accomplished before conclusion of the Commission's reconsideration in this case; indeed, the very fair presentation made on behalf of the NH Trustees admitted as much. The Trustees' claims are rather that the longer consummation of the merger is postponed, the larger the risk of its being prevented by some untoward development, and that the greater the uncertainty of consummation, the harder will be the Trustees' task in obtaining the assistance from

governmental bodies [8] and the continued forbearance by creditors necessary to keep the property going. Granting some force to these contentions and acknowledging that immediate consummation would be in the public interest in assisting the Trustees in their onerous duties, we think the unanimous finding of the Commission that the PRR–NYC merger conditioned on inclusion of NH is in the public interest, well supported and largely unassailed, should give a sufficient measure of the assurance required. We therefore do not rest heavily on what plaintiffs too derisively term the New Haven panic button.

We turn now to the first two factors governing the exercise of our discretion. The claim of lack of hearing with respect to the protective conditions is shattered by the Commission's report on reconsideration. Whatever merit this point may have had initially—and, without passing on that issue, we are far from reading the Commission's report on reconsideration as conceding this—all interested parties are now to be fully heard. We see no force in the point that the special traffic conditions will subsist pending further order; these conditions, designed to preserve the pre-merger *status quo,* can only help the protected roads, and the others do not and could not claim that the traffic, as distinguished from the financial, conditions will hurt them. A more important contention is that the order is fatally defective from a procedural standpoint for failure to comply with § 5(2) (b), which requires the Commission to "enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable". The plaintiffs say that by leaving these open for future determination in important particulars, the Commission did not do what Congress required before it can lawfully approve a railroad merger.

We find no such categorical imperative in the Interstate Commerce Act. Section 5(9) expressly provides that the Commission may "from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7) of this section, as it may deem necessary or appropriate." Moreover, orders under § 5(2) have regularly retained jurisdiction, as did that initially issued here, "for the purpose of making such further order or orders herein as may be necessary or appropriate, in addition to those orders under jurisdiction expressly retained in said report of the Commission and to those orders which may be issued under section 5(9) of the Interstate Commerce Act." The validity of the Commission's authorizing carriers to take action while retaining jurisdiction to impose conditions in the future is strongly sustained by United States v. Rock Island Motor Transit Co., 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951); American Trucking Ass'ns, Inc. v. United States, 355 U.S. 141, 154, 78 S.Ct. 165, 2 L.Ed.2d 158 (1957); and American Trucking Ass'ns, Inc. v. Frisco Trans. Co., 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958). We are unable to follow our dissenting brother's distinction of these decisions; indeed they seem *a fortiori* since they sustain the validity of a reservation of power to impose conditions against challenge by the carrier on whom they are imposed whereas here that carrier will have consented. In other respects the situations are rather strikingly similar; the Commission was willing to issue a motor carrier certificate to a railroad affiliate if but only if it could be assured of ability later to limit the operations in the light of the policy expressed in the section of the statute dealing with acquisitions. United States v. Seatrain Lines, Inc., 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1946), and CAB v. Delta Airlines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.

---

**8.** We are unable to share our dissenting brother's optimism that a recent interesting proposal by the governors of New York and Connecticut to take over certain NH passenger operations, largely with uncommitted federal funds, constitutes a solution to NH's problems.

2d 869 (1961), dealing with attempts to alter certificates without a specific reservation or contrary to express statutory mandate are inapposite. On the other hand we do find pertinent and helpful the Supreme Court's approval—indeed, insistence—that certificates under § 7 of the Natural Gas Act be conditioned so "that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined", the condition acting "to hold the line awaiting adjudication of a just and reasonable rate." Atlantic Refining Co. v. Pub. Serv. Comm., 360 U.S. 378, 392, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959).

■ If the Interstate Commerce Commission had initially prescribed only the special traffic conditions and reserved jurisdiction to reconsider these with a view to strengthening them and also to imposing an indemnity, with the Transportation Company bound to accept such changed or additional conditions if it consummated the merger, we would surely not have found the order formally defective under § 5(2) (b) at the suit of other carriers. Yet the only difference between such an order and what has happened is that the Commission initially prescribed financial conditions and then withdrew them for further consideration, with power to impose new conditions retroactively to the date of the merger. On the assumption most favorable to the three protected lines, namely, that the Commission first considered the indemnity provisions necessary to afford full protection to them and now, confronted with some of the problems such provisions create, is not so sure of their desirability or essentiality, as one member was not from the outset, 327 I.C.C. 551, the Commission would simply have exercised the prerogative of considering whether it should change its mind on the method best adapted to attain its objectives. The vital findings from which we would not allow the Commission to depart, at least without complete explanation, are that "impairment or serious weakening" of any of the three carriers

by the merger would be contrary to the public interest, that these carriers would be impaired or seriously weakened pending inclusion in a larger system unless something more than the standard traffic conditions were imposed, and that special interim conditions of some sort must be devised "to obviate impairment or serious weakening of E–L, D & H or B & M, or the rendering of them individually or collectively substantially less capable of providing service to their shippers and connections." 327 I.C.C. 531–32. These are the findings to which the Commission is committed and to which it willingly adheres, its desire to give further thought to its initial choice of means to achieve these ends—means which the Commission did not and could not rationally decide to be the only suitable ones—does not render its order technically defective if the applicants are willing to proceed without knowing precisely what the Commission may require of them. The decision on reconsideration in which, after careful review of the objections, the Commission reiterated "that the public interest requires prompt consummation of the proposed merger" is not merely an implicit but an explicit finding that it is in the public interest for the merger to be consummated on the basis proposed. To be sure, what we have said would in no way cover the hypothetical case, suggested in the dissent but unlikely to be encountered in life, where the Commission approved a merger and left all conditions subject to further consideration. But to analogize such a case to this one, with page after page of carefully considered conditions of every sort, special traffic conditions highly favorable to the three protected carriers, and an assurance that in addition financial conditions of one or both types will be speedily imposed if found necessary on reconsideration, would be to ignore all that Mr. Justice Holmes taught us on the score of differences of degree. See Noble State Bank v. Haskell, 219 U.S. 104, 112, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062 (1911); LeRoy Fibre Co. v. Chicago, M. & St. P.

Ry., 232 U.S. 340, 354, 34 S.Ct. 415, 58 L.Ed. 631 (1914) (concurring opinion). We thus conclude that plaintiffs cannot prevail on a claim that the order must be invalidated as formally defective even if in fact all their rights have been adequately secured. It is that question which requires careful study in a practical frame.

The contentions of the unprotected carriers as to the diversionary effects of the indemnity provisions have been sufficiently met by the Commission's grant of further hearing and reconsideration. When this has been completed, we may find provisions carefully tailored to prevent or at least minimize the feared manipulation or, conceivably, financial provisions of an entirely different character; at the very least we will have a record and findings as to the effect on these carriers of such provisions as are imposed. The same is true with respect to the contention of the unprotected carriers that the indemnity provisions constitute a pool requiring action by the Commission under § 5(1). Perhaps there will be no provisions that could even arguably come under that section; if there are, the Commission may decide to make findings under § 5(1) and these also can be reviewed. For reasons later discussed we are unable to see how consummation would prejudice the unprotected carriers in obtaining effective review of such protective financial conditions as may be imposed. All that remains is the claim that the very potentiality of retroactive indemnity provisions similar to those initially prescribed will lead the protected carriers and the Transportation Company, immediately on consummation, to pursue the same diversionary tactics the complainants fear. But we cannot find, in the light of the opposing affidavits submitted by NYC, of the Commission's finding in its re-

port on reconsideration that "the task of implementing a merger of this size is so vast and complex that its competitive effects will be felt only gradually," and of our subsequent discussion, that the possibility of such action for the period required for reconsideration and review poses such a serious threat of unwarranted legal injury to the unprotected carriers[9] as to justify a temporary injunction against consummation, in the light of the countervailing factors we have outlined.

Turning to the protected carriers, if one begins by assuming that the Interstate Commerce Act guarantees smaller railroads one hundred percent protection against the adverse effect of a merger of larger ones, it is quite true that the three lines do not now have this. Indeed, because of the uncertainty as to the future, of the indemnity provisions, at the moment they are farther from that pleasant position than under the order initially adopted, although they have a fair chance of ultimately coming closer to it. However, we find no basis for this inarticulate premise. What the law requires, and what the Commission found it to require in both reports, was that the merger should not affect the viability of the three carriers between consummation and a fair opportunity for incorporation into larger systems; when the Commission in its first report framed conditions designed "to prevent *any* loss of revenue, * * * as a direct result of immediate consummation of the merger," 327 I.C.C. 532, during this interim period, it did something doubtless within its powers but beyond the Act's demands. The three carriers have made no showing that would have led us to enjoin consummation of the merger if the Commission had been satisfied with the special traffic conditions in Appendix G, themselves going far beyond anything in

9. We should make clear that we do not necessarily subscribe to the premise, implicit in the argument of these carriers, that any temporary diversion to the protected roads or to the merged company as an incidental result of indemnity provisions would constitute an injury forbidden by the Interstate Commerce Act, especially with respect to roads that have themselves been the recent beneficiaries of merger.

previous history.[10] We fail to see how they stand better because the Commission, having initially prescribed a still more unusual indemnity as a back-stop in the unproved eventuality that the special traffic conditions should not prove fully effective, now wishes to reconsider the latter with a view to strengthening them in the light of the extensive suggestions by their beneficiaries, and then to determine whether and what financial provisions may be required as a further protection, with the Transportation Company bound to accept the determination so made. The Commission's report on reconsideration is in no way a finding that the initial traffic conditions were ineffective. A mere reading of their text is enough to belie any such view, and the criticisms proffered by the protected roads scarcely claimed that but rather proposed ways to make them still more effective which the Commission now intends to explore. Meanwhile these carriers have the further assurance deriving from the Commission's general statement as to the need of "active cooperation" by the Transportation Company. 327 I.C.C. 532. Far from this statement being a confession of weakness in the traffic conditions, the report on reconsideration carefully explains that it constitutes "an implicit admonition that any conduct frustrating the purposes of the protection would render the applicants subject to the prescribed recourse and, if need be, to substantial revision of our approval order * * *." It puts teeth into the provision of Appendix G that,

beyond all specific proscriptions, the Transportation Company shall not "take any action or engage in any practice or conduct contrary to the purpose and general objectives of this condition as explained in this report"; it warns that cleverness in working around the specific conditions not only will accomplish nothing but may lead to serious retribution. We wholly fail to understand how with all this there can be legitimate fear that the protected carriers "may find themselves in a state of continuing deterioration" in the next few months, during which their suggestions for strengthening the conditions are receiving study and any foul blows would be the subject of immediate and effective complaint.

It was undisputed that, even without the special traffic conditions, some time must pass before the merger would have serious adverse effects on anyone. We have already referred to the Commission's finding in its report on reconsideration that "the task of implementing a merger of this size is so vast and complex that its competitive effects will occur only gradually." The Commission cited testimony in the N & W merger proceeding by Mr. William White, chief executive officer of E–L and D & H and a former president of NYC, in which he conceded, with customary candor, that E–L would not be substantially affected by a PRR–NYC merger in the first year. Counsel for B & M admitted at the argument that the diversionary effects of the merger would be less to it than to E–L and D & H. Even with respect to D & H,

---

10. It is worthwhile to set out some of them. The basic mandate is that during the protective period "the merged company shall not publish or provide for any new or changed routing practice and/or freight rates or services, either locally or jointly with other carriers, which would divert or tend to divert traffic from routes in which E-L, D & H or B & M, now participates, or participated at the time this merger application was filed, or take any action or engage in any practice or conduct contrary to the purpose and general objectives of this condition as explained in this report." 327 I.C.C. 561. Beyond this, "when any of the described

freight traffic is delivered to carriers of the merged system, it shall be allocated among the routes of the system in accordance with practices employed by the system's railroads at the time this merger application was filed"; and through routes and joint rates shall be maintained with the same vigor as heretofore. Ibid. The Commission recognized these conditions were so far-reaching as "to deny to applicants and some shippers, for the time being, some of the merger benefits," 327 I.C.C. 532; however, this would be in the early years, see fn. 4, when many of the physical changes needed to provide these benefits would not yet have been made.

which may be more vulnerable because of the importance of its interline traffic with PRR, Mr. White testified he "would expect it would take a little while for the adverse effect to flow." Although a D & H traffic witness estimated that 35% of a predicted ultimate annual loss of $4,-119,986 in freight revenues would be experienced in the first year, this took no account of the highly beneficial effect of the special traffic conditions which, on any view, will sharply reduce the loss. Such evidence, coming from the protected roads themselves, affords rather complete assurance against dire prophecies of "devastating losses to lines which may not be able to survive." And, for reasons already indicated, the immediate consequences of the alleged diversionary effect of potential indemnity provisions on other carriers are even more conjectural and remote.

The further proceedings before the Commission should not be lengthy. Many criticisms of the conditions are in the nature of drafting changes designed to make clear what the Commission evidently intended,[11] and most others concern points that are matters for argument rather than evidence. We would suppose issues of this sort could be handled by exchange of comments; indeed, the full and helpful criticisms by the protected roads have already been in the Commission's hands for three months. The only subjects on which any extensive evidence would seem to be needed are the reality and the dimensions of the diversion that indemnity provisions of the sort proposed would cause for other roads, and the affidavits submitted to us show both sides to be well advanced in preparing this. Indeed, the Commission has already moved with efficiency and dispatch. By order served September 30, 1966, it has set the proceeding for hearing on October 31, and

has directed that the capital loss indemnification issue be first heard in order that the Commission, if it so desires, may determine that matter prior to its determination of others. The order also appropriately provides for dispensing with a recommended decision by the examiners, the case clearly being one where "due and timely execution of its functions imperatively and unavoidably so requires." APA § 8(a). In short we perceive no reason why, with the cooperation from the parties on which the Commission is entitled to insist, all hearing procedures cannot be completed around the turn of this year and new conditions fixed by the spring of 1967.[12]

Recognizing that this point cuts both ways, we think the net effect weighs against the plaintiffs. This is not only because they have the burden of making out a case for a temporary injunction but because, in a realistic sense, we are dealing with different periods of time. Modified traffic conditions will become effective "as of the date prescribed in a modification order," which can surely be entered by the spring of 1967; indeed, there is no reason why proposals for clarification on which the protected carriers have so much the better of the argument as to require little study cannot be made effective long before that. Revised indemnity provisions "will be made applicable to the date the merger is consummated" and the Commission is considering deciding the capital loss issue in advance. On the other hand, any estimate of the delay incident to enjoining the merger pending reconsideration must take account of the near inevitability of requests for reconsideration of the modified conditions and renewed court proceedings. We could hardly say in advance that we are sure these will not warrant judicial consideration—indeed, the basis most strongly urged in

11. An example is the concern expressed over use of the conjunction "and" rather than "or" in the phrase "on traffic for which E-L, D & H and B & M are competitive factors."

12. Although the dissent characterizes this view as "sanguine," it proposes a timetable we would regard as impossible—namely, decision "reasonably soon after commencement of the hearing or by the end of the year."

the dissent is an alleged need for an injunction in order to preserve our freedom to entertain these very complaints. In any event the plaintiffs would have a statutory right to come to us and to appeal to the Supreme Court if we should rule against them. When account of all this is taken, any realistic estimate of delay of consummation from an injunction pending reconsideration would take us to the end of 1967.[13] The dissent's enticing reference to "a slight delay beyond November 1, 1966," regrettably does not jibe with the hard facts of life. Before compelling a delay of this magnitude, in a case already long considered by an expert administrative agency, a court should be certain that its action is truly necessary to achieve the stated objectives of Congress rather than to comply with its own concepts of the most desirable procedure.

The remaining issue requiring examination is whether denial of an injunction would impair the plaintiffs' rights to effective review. One point in this general area that was strongly pressed at the argument has now wholly disappeared. This was a fear that the Transportation Company might prolong uncertainty for the three lines by seeking review of revised conditions imposed by the Commission on reconsideration. Although PRR and NYC were undoubtedly entitled to review of the traffic and financial conditions imposed in the report and order of April, 1966, they could have had this only at the price of delaying consummation; we do not think that the Commission intended or that a court today would tolerate their consummating the merger and then challenging these conditions, to which consummation constituted an irrevocable assent. Cf. United States v. Chicago, M., St. P. & P. R. R., 282 U.S. 311, 331–32, 340–344, 51 S. Ct. 159, 75 L.Ed. 359 (1931) (dissenting opinion of Stone, J., concurred in by Holmes and Brandeis, JJ.).[14] We read the Commission's report on reconsideration as meaning that the Transportation Company by consummating the merger similarly waives any right to review of new traffic or financial conditions to be imposed for the protection of E–L, D & H and B & M as a result of the hearing on reconsideration, with the single exception, specified in the report, of any provision indemnifying the three roads against loss of capital values. The supplemental brief for the Commission authoritatively confirms that this was indeed its intent; in a supplemental memorandum, PRR and NYC acknowledge this, agree to support that construction, and "expressly waive any right they may have to judicial review of any post-merger modifications of the protective conditions resulting from the further hearing and reconsideration except to the extent provided for by the Commission in its Report decided September 16, 1966."

The other claim is that review of the traffic and financial conditions resulting from reconsideration would be ineffective. Here also one principal basis can be quickly eliminated, in part because of a concession. Plaintiffs argued that their only recourse would be to seek an order requiring the Transportation Company to dissolve the merger unless it would voluntarily accept new conditions resulting from review; they feared with reason that even if a dissolution were in the realm of reality, highly doubtful in

13. Although we recognize that decision on any complaints as to the new conditions would also be postponed pending review, we cannot take seriously, for reasons indicated in the opinion, an argument that the new conditions may be so weak as to imperil the three carriers or so strong as appreciably to injure others during that period.

14. We limit this conclusion, in the usual case, to conditions stated with sufficient definiteness to be ripe for pre-consummation review, as distinguished from conditions later imposed under § 5(9) or under a general reservation of jurisdiction. We express no opinion as to other issues that may arise, e.g., whether the waiver, through consummation, of a right to review of a condition requiring inclusion of another carrier also covers the equitable terms and conditions to be prescribed.

this instance, its adverse effects would impair true freedom of decision. But there is simply no support for the position that, subject to the normal limitations on judicial review of administrative action, we could not direct reconsideration of a condition as such. The Judicial Code, 28 U.S.C. § 2321, refers to "actions to enforce, suspend, enjoin, annul or set aside *in whole or in part* any order of the Interstate Commerce Commission other than for the payment of money or the collection of fines, penalties and forfeitures". Federal Power Comm. v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L. Ed. 15 (1952), cited by the plaintiffs in their supplemental briefs is not to the contrary. What was there held was that a reviewing court could not simply excise a condition on which the FPC had granted a license and leave the unconditioned license in effect. This is wholly inapplicable to a claim by the protected roads that the Commission had failed to impose conditions adequate under the statute and its own findings and we should require better ones. And although the unprotected roads would be demanding that any conditions similar to the indemnity provided in the initial report be eliminated or modified, we see no reason why a court, if it should deem these contentions to be well founded, could not require appropriate change; we cannot take seriously the dismal forecast that conceivably it might prove impossible to fashion any financial conditions that would give adequate interim protection to the three lines without unlawfully harming others, see fn. 9. The supplemental memorandum of PRR and NYC concedes that a court reviewing the new protective conditions can set them aside and remand them without having to "set aside the whole order and risk unscrambling of the merger itself," the Commission agrees, and we will hold the defendants to that concession.

With this point out of the way we find no substantial basis for the assertion nevertheless still advanced that judicial review of new conditions would be ineffective if the merger has occurred. The claim is that a court could only express dissatisfaction with what the Commission did, leaving the agency to try again. We cannot believe that, on such narrow issues as will here be presented, courts and commissions must engage in such an infinite regression. If we should consider the new conditions so inadequate for the protected carriers or injurious to others as to violate the law, an eventuality which because of the technical nature of the subject-matter is by no means likely, we are confident we could inform the Commission in a way it would thoroughly understand. During the pendency of review of revised conditions and such a possible remand, new conditions for the benefit of the protected roads would remain in effect except as we otherwise ordered. To suggest that, after all the Commission has said, its new conditions will so far depart from its professions as to imperil the survival of the three carriers during the pendency of review would be an unwarranted reflection on either the Commission's good faith or its competence.

■ Since all affected carriers are thus to have a further expedited hearing before the Commission with respect to protective conditions, since the Transportation Company concedes it is precluded from seeking review of any new traffic or financial conditions in favor of the three roads resulting from the reconsideration (save as to impairment of capital values), and since all roads are assured of judicial review of the protective conditions ultimately imposed as effective as is now available, we find no sufficient basis for delaying for a year or more the public and private benefits from the merger found by the Commission and recognized by the plaintiff carriers themselves. We would indeed have been happier if this package had come to us with every ribbon firmly tied. But administrative agencies are not held to a standard of perfection that would render them unique among organs of government; it is enough if they have substantially performed their assigned tasks and have not abused the discretion con-

fided to them. The Commission is to be commended rather than criticized for its imagination in fashioning new conditions to deal with new cases, for its willingness to take a fresh look at these when significant objections were offered, and for its constructiveness in then designing a procedure that would permit the merger to go forward in the meanwhile with adequate protection to all. In this truly unique case, where there is no substantial dispute over the ultimate merits of a commission-approved merger and the sole significant legal issue is the propriety of consummation before the protective conditions have been completely determined, judicial responsibility is limited. Once we have concluded that there is no basic procedural illegality, our task is simply to determine whether plaintiffs' rights have been adequately protected, and even as to that we are bound to give the Commission's views substantial weight. As a leading scholar has wisely written, the expertise of administrative agencies often extends to procedural matters also; "in the absence of a clear legal prescription, a reasonable procedural decision should withstand judicial interference." Jaffe, Judicial Control of Administrative Action 565–69 (1965).

Even on the usual tests it is altogether plain that to enjoin consummation of the merger pending proceedings on reconsideration would cause certain and substantial damage to PRR, NYC and the public, whereas the most that any of the plaintiffs has made out is a conjectural possibility of harm in the interim and that small in amount. The disproportion is not simply because this is a big merger and the plaintiffs are smaller lines but because of the minor share of their traffic that is in jeopardy and the negligible hazard even to that over the next few months. However, we are not truly empowered in this case to engage in the same kind of weighing and balancing and then making our own decision as to optimum procedure that we would be if we were reviewing the action of a lower court. It is not for us to deprecate the public and private advantages of permitting the applicants to proceed with the many important projects long on the drawing board whose importance to the national welfare and defense the Commission fully understands and we do not, or to magnify out of all proportion the immediate problems of the protected roads with which the Commission is fully familiar and entirely sympathetic. The Commission surely can appraise far better than we what effect a year's delay of consummation would have on the jockeying of these roads and of the three plaintiffs in the C & O, B & O, and N & W actions for price and position in respect of other mergers—which, despite all the words, is what we suspect these actions to be mostly about. We would be assuming powers not confided to us if, once we have acquitted ourselves of our limited task, we were to pit our necessarily ill-informed judgment on these imponderables and their procedural entailments against the unanimous conclusion of the agency to which Congress has given authority for decision and on which it has placed responsibility for achievement.

 The motions for a temporary injunction are therefore denied. However, to permit plaintiffs or intervening plaintiffs to make application for a stay of consummation of the merger to the Circuit Justice, the temporary restraining order heretofore entered will remain in effect through October 7, 1966, and if application for a stay of consummation shall have been filed with the Clerk of the Supreme Court before the close of business on that day, until determination of such application by the Circuit Justice or other direction by him or by the Supreme Court.

It is so ordered.

WEINFELD, District Judge (dissenting):

I am of the view that the recision of one of the conditions and the reopening for further consideration of the other conditions originally imposed by the

Commission for the protection of the three carrier plaintiffs, the Erie-Lackawanna (E–L), Delaware & Hudson (D&H) and Boston & Maine (B&M), (the protected carriers), as a prerequisite to the consummation of the merger requires the granting of the interlocutory injunction.

The elimination in advance of the merger of a substantial "term and condition" and the reopening of others, all of which the Commission itself deemed essential in authorizing consummation, removes the foundation for its ultimate finding under section 5(2) (b) of the Interstate Commerce Act[1] that the proposed merger will be consistent with the public interest, and hence the validity of the Commission's order authorizing the merger is cast in grave doubt. The Commission having found the public interest requires E–L, D&H and B&M be protected against the impact of a merger, its consummation should be deferred until the Commission finally resolves the now open issue of those protective terms and conditions.[2] Under the Commission's findings in its April 1966 report the protective terms and conditions are conditions precedent, not conditions subsequent to the merger. The short of it is that up to this point the Commission has failed to complete its statutory duty under section 5(2) (b).

To put matters in proper focus it should be noted that none of the intervening carriers challenges the need for realignment of the railroad industry in the northeastern quadrant of the United States[3]—on the contrary, the three pro-

tected carriers seek eventual inclusion in the implementation of that program.

Structurally, the revamping of the railroads in the east has taken the form of setting up three unified systems under mergers or consolidations. Two mergers have already been achieved—the Chesapeake & Ohio-Baltimore & Ohio system (C&O–B&O),[4] and the Norfolk & Western-Nickel Plate-Wabash system (N&W).[5] The third step in the restructuring of the roads is the Penn-Central—the subject of this suit—one that, qua merger, is not opposed by any of the carriers, although opposed by some individuals, communities and groups. In fact, the three protected carriers contend that, as against the already merged systems, C&O–B&O and N&W, and the now authorized Penn-Central system, they are doomed to extinction as independent carriers, and that the public interest requires their inclusion in either the N&W or the Penn-Central system, preferably the former. Their petitions for inclusion, opposed by both groups, are still pending.

What the protected carriers challenge is the consummation of the merger without terms and conditions adequate to protect them from its impact during the pendency of their inclusion proceedings. Such protection is also essential to assure, in the light of the Commission's finding that the public interest requires the continued and unimpaired service of these carriers, that the merger will be consistent with the public interest.

The predicate for protective terms and conditions was the Commission's orig-

1. 54 Stat. 906, 49 U.S.C. § 5(2) (b).

2. Cf. Seaboard Air Line R.R. v. United States, 382 U.S. 154, 156–157, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965).

3. For discussion of this subject, see Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19, 22 (E.D.Mich.), aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963).

4. 317 I.C.C. 261 (1962).

5. 324 I.C.C. 1 (1964). Within the last year, C&O–B&O and N&W have proposed

that the Eastern District be restructured into only two principal systems. One would be the Penn-Central system; the other would be created by the merger of C&O–B&O and N&W which would include the direct control by such merged system of CNJ, Reading and Western Maryland, in all of which there presently exist large equity interests of C&O–B&O, and by the inclusion of E–L, D&H and B&M in a new company which would be controlled by the merged C&O–B&O–N&W company.

inal finding in its report of April 6, 1966:

"It is doubtful that, without inclusion in a major system, these three carriers could withstand the competition of the applicants merged, and, unless they are protected during the period necessary to determine their future, we would not authorize consummation at this time, even though approving the merger." [6]

The Commission, based upon the Examiners' report which recognized that the merger would bring in its wake difficult problems for the three carriers and consequently required protection through inclusion or by some other equitable means, withheld action on their alternative inclusion petitions in the Penn-Central proceeding until final disposition of their pending petitions in the N&W merger case. However, the Commission undertook by "other equitable means," the Appendix G conditions, to protect the three lines pending final determination of their petitions for inclusion.

The Commission, with respect to this matter, made these significant findings:

"The service the three petitioners render their shippers is essential and the public interest dictates that it be preserved. Unless somehow protected, through inclusion herein or by some other equitable means, the petitioners would be adversely affected by the proposed merger to a serious degree and would be severely handicapped in providing required transportation to the highly industrialized areas they serve. * * * [7]

\* \* \* \* \* \*

" \* \* \* [W]e conclude that immediate consummation of the proposed merger would be consistent with the public interest, if conditions are imposed to obviate impairment or serious weakening of E–L, D&H or B&M, or the rendering of them individually or collectively substantially less capable of providing service to their shippers and connections.

"It is doubtful that, without inclusion in a major system, these three carriers could withstand the competition of the applicants merged, and, unless they are protected during the period necessary to determine their future, we would not authorize consummation at this time, even though approving the merger." [8]

Finally, the Commission concluded:

"Our approval of the merger for undelayed consummation shall be subject, therefore, to the conditions specifically described in appendix G." [9]

The conditions imposed in Appendix G as a sine qua non of consummation of the merger were in substance of a twofold nature:

(1) traffic restrictions under which the railroads which make up the Penn-Central system are to be considered separate railroads during the protective period in order to preserve the status quo by preventing diversion of traffic from the three lines to the merged system; and

(2) indemnification based upon the total 1964 freight revenues of the merged lines and each of the protected companies and designed to provide indemnity by the Penn-Central to the three lines against loss of revenue.

The importance of these protective safeguards as a condition of the merger appears from the Commission's "Statutory Findings and Ultimate Conclusions," which read:

"Subject to the various conditions set out in this report, including * * [appendix G], we find (1) * * * (a) merger of * * * The New York Central Railroad Comany into The Pennsylvania Railroad Company * * * upon the terms and conditions found herein to be just and reasonable, are transactions within the scope of section 5(2) of the Interstate Com-

---

6. 327 I.C.C. 475, 532 (1966).

7. 327 I.C.C. 475, 529 (1966).

8. 327 I.C.C. 475, 532 (1966).

9. 327 I.C.C. 475, 532 (1966).

merce Act, will be consistent with the public interest * * *." [10]

The Commission report, and particularly Appendix G, drew fire from two separate groups. The three "protected" lines, E–L, D&H and B&M, challenged the traffic conditions as totally ineffective to achieve their intended purpose; they detailed their specific objections in comprehensive briefs filed with the Commission. They also attacked the indemnification terms as based upon an improper formula. They insisted they are entitled to protection against capital impairment resulting from diversion of traffic—a matter of prime importance in connection with their pending inclusion petition. In sum, they charged that both the protective devices were totally inadequate to achieve their avowed purpose.

Other lines, N&W, C&O–B&O, CNJ and C&EI, on the other hand, contended that the indemnification provision would permit manipulative practices; that the indemnification terms would only serve to compound the evil of diversion of freight traffic and thus impair their effectiveness as carriers and their capacity to serve the public. The thrust of their complaint was that the merged lines, in order to reduce indemnity payments, would be under an incentive, where competitive freight conditions exist, to divert traffic to the protected carriers; and in turn, the protected carriers would transfer traffic to the merged lines to increase indemnity payments. Most of these lines further charged that although they, too, faced adverse and detrimental factors, the Commission discriminated against them by not providing, however inadequate, the same protective features extended

to the protected carriers.[11] These unprotected carriers also contended that the indemnity arrangement is in effect a "pooling arrangement" prohibited by section 5(1) of the Interstate Commerce Act.[12]

And finally, both groups attacked the traffic and indemnity provisions, the latter admittedly unique, as having been imposed by the Commission without notice to any of the parties affected and without affording them an opportunity to be heard, and as unsupported by any findings or evidence as to their impact upon those entitled to notice and hearing in violation of section 5(2) (b) of the Interstate Commerce Act [13] and sections 5(a), 5(b), 7(c) and 8(b) of the Administrative Procedure Act.[14] They contended that these defects were so substantial as to amount to a denial of due process of law under the Fifth Amendment.

The two groups, based upon their respective and differing contentions, sought a reopening and reconsideration by the Commission. Shippers, communities and individuals sought reconsideration on other assigned grounds, contending that most of the findings lack evidentiary support and are based upon an erroneous construction of the applicable law. The Commission, after various intermediate orders, extended the effective date of the merger to September 30, 1966, without passing upon the applications for reconsideration. With the applications still undetermined, E–L commenced this suit on September 7, 1966. Others promptly commenced actions or intervened as plaintiffs. The actions were consolidated, and after the statutory court had been appointed, a hearing was set to consider both the application for a

10. 327 I.C.C. 475, 547 (1966).

11. The Commission recognized the problem with respect to these lines, but was of the view that indemnity protection was not required because "of new traffic relationships between * * * nonparticipating carriers, their affiliates and non-aligned carriers. * * * [T]he net effect will not be detrimental to such

carriers * * *." Examiners' Report, p. 305, adopted by the Commission, 327 I.C.C. 475, 481 (1966).

12. 54 Stat. 905, 49 U.S.C. § 5(1).

13. 54 Stat. 906, 49 U.S.C. § 5(2) (b).

14. 60 Stat. 239–242, 5 U.S.C. §§ 1004(a), 1004(b), 1006(c) and 1007(b).

temporary restraining order and an interlocutory injunction. On September 21 the matter was heard.

The Commission, however, on September 19, two days before the hearing, issued a report dated September 16 which granted in part various petitioners' applications for reconsideration to determine: (1) in what respect the provisions of Appendix G should be modified; (2) what, if any, modification is needed to prevent manipulative practices which some of the petitioners urged were inherent in provisions of Appendix G; and (3) whether or not capital loss indemnification should be imposed. It rescinded the indemnification provision, but directed that the traffic conditions, although subject to modification, were to remain in effect pending reconsideration.

Although the Commission rescinded one of the principal protective features, it refused to defer consummation of the merger pending reconsideration of the issues as to which the reconsideration was granted. However, it conditioned consummation upon Penn-Central's irrevocable acceptance of post-merger modification of the protective conditions and waiver of judicial review thereof, the consummation itself to be deemed such acceptance except as to the capital loss indemnity issue. Any indemnity provision would be retroactive to the date of consummation.

Following argument the Court granted a temporary restraining order. The issue remains whether an interlocutory injunction should be granted. As already indicated, I am of the view that it should be, at least during the pendency and determination by the Commission of the matters to be reconsidered by it.

Permitting consummation of the merger while the indemnity condition, now revoked, and the traffic conditions, challenged as inadequate and now subject to complete revision, are under reconsideration and unresolved, conflicts with the Commission's "Statutory Findings and Ultimate Conclusions" of April 6, 1966, already quoted, that only subject to those traffic and indemnity conditions as enumerated in Appendix G would the merger be consistent with the public interest. Those findings and ultimate conclusions were made, as the Commission stated, within the scope of section 5(2) (b) of the Act, which defines and limits the Commission's authority in passing upon mergers and consolidations:

"If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: * * *." [15]

The action of the Commission in authorizing the merger to proceed without adherence by the applicants to the terms and conditions which it, as required by the statute, found just and reasonable in authorizing the merger, opens to serious question its ultimate finding that the merger will be consistent with the public interest, and consequently raises a substantial issue of the validity of the Commission's order.

The Court and the Commission, as does the Penn-Central, take the position that section 5(2) (b) empowers the Commission to make a finding that a merger is in the public interest, subject to terms and conditions found fair and reasonable, to authorize its consummation, and to leave for future determination the definitive terms and conditions essential for the protection of the three carriers pending inclusion proceedings. This power of reserved jurisdiction is asserted to be implied from section 5(2) (b) itself, from the established practice of the Commission of regularly retaining jurisdiction in its orders thereunder, and to be expressly granted by section 5(9).

15. 54 Stat. 906, 49 U.S.C. § 5(2) (b).

The Court, as I understand its position in support of this view, rests upon the postulate that the findings essential to a determination that the merger will be consistent with the public interest are not the terms and conditions in Appendix G, but rather that:

"The vital findings from which we would not allow the Commission to depart, at least without complete explanation, are that 'impairment or serious weakening' of any of the three carriers by the merger would be contrary to the public interest, that these carriers would be impaired or seriously weakened pending inclusion in a larger system unless something more than the standard traffic conditions were imposed, and that special interim conditions of some sort must be devised 'to obviate impairment or serious weakening of E–L, D&H or B&M, or the rendering of them individually or collectively substantially less capable of providing service to their shippers and connections.' " [16]

This interpretation, however, disregards the Commission's own findings as to essential protective requirements. The Commission, in addition to the "vital" findings quoted by the Court, went much beyond; it delineated the specific terms and conditions in Appendix G necessary to prevent "impairment or serious weakening" of the three carriers in order to conclude that the merger is in the public interest and to authorize its consummation.

When the Commission, in granting reconsideration, rescinded its previously required Appendix G conditions and permitted immediate consummation, the carriers were exposed to the same serious adverse factors as the Commission previously found would be the result of a merger unless, pending reconsideration, adequate protection were provided. The majority takes the position that the Commission's decision on reconsideration constitutes a finding [17] that it is in the public interest for immediate consummation based on the terms set forth in the reconsideration decision, already adverted to,[18] that such terms provide the adequate interim protection to the carriers until the final determination of the protective terms and conditions "during the period necessary to determine their future." [19]

Apart from the fact that the Commission, in its order on reconsideration, made no finding or statement that such terms as remained after recision of Appendix G afforded protection during the period of rehearing, the difficulty with this view is threefold:

(1) the finding whether "explicit or implicit" [20] clashes head on and is inconsistent with the Commission's original finding of April 1966 as to what protective terms and conditions are required,

16. Supra, p. 20b.

17. There is a substantial question as to whether, even assuming the September 16 report contains such a finding, it is sufficient to support the decision to permit immediate consummation. Section 8 (b) of the Administrative Procedure Act provides that all agency decisions shall include " * * * a statement of (1) findings and conclusions, *as well as the reasons or basis therefor*, upon all the material issues of fact, law, or discretion presented on the record; * * *" [emphasis supplied] 5 U.S.C. § 1007(b). Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ; Atchison, T. & S. Fe Ry. v. United States, 218 f' Supp. 359, 369 (N.D.Ill.1963). See also Northeast Airlines, Inc. v. CAB, 331

F.2d 579, 586 (1st Cir. 1964); United States v. Chicago, M., St. P. & P. R.R., 294 U.S. 499, 510–511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). But see, Deioma Trucking Co. v. United States, 233 F. Supp. 782, 784 (N.D.Ohio 1964).

18. Supra, p. 985.

19. 327 I.C.C. 475, 532 (1966).

20. The majority finds the Commission's order "not merely an implicit, but an explicit" finding to this effect. Not without interest is that Penn-Central contends for no more than an "implicit" finding that the prohibitions against traffic diversion and other terms in the Commission's order on reconsideration are sufficient protection during the period of rehearing. Penn-Central brief, p. 17.

so that the merger will be consistent with the public interest;[21]

(2) neither the April 1966 Appendix G terms and conditions nor the September 1966 "terms" were imposed after a hearing, a matter discussed hereafter; and

(3) section 5(2) (b) nowhere vests authority in the Commission to permit a merger to be consummated on an interim basis pending its future determination of the terms and conditions necessary to support the merger as in the public interest.

The procedure of interim authorization here adopted by the Commission, carried to its logical conclusion, would permit consummation of a merger upon a general finding that a proposed merger is in the public interest, subject to terms and conditions to be reserved for future determination. The terms and conditions upon which a merger is contingent in order to satisfy the public interest go to the very validity of the merger. The statute, which provides that the Commission "shall enter an order approving and authorizing such transaction, upon terms and conditions, and with the modifications, so found to be just and reasonable", gives support to the plaintiffs' view that protective terms for the three carriers, found essential to validate this merger, must be spelled out by the Commission before and not after it authorizes consummation.

This is not to say that once a valid order in compliance with the statute is entered the Commission does not have power to retain jurisdiction thereunder or under other statutory provisions to make modifications necessary in the light of subsequent changed circumstances, or to assure compliance with terms and conditions previously imposed or to correct technical or clerical errors.

Whatever express or implied powers the Commission possesses with respect to modifying, supplementing or reconsidering the terms of an issued order presuppose that the original order is valid. An originally invalid order should not be upheld on the ground that it may be validated by subsequent section 5(9) orders.[22]

Further, while it is true that under section 5(9) the Commission has the power to "from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2) or (7) of this section, as it may deem necessary or appropriate", the Commission's power under this section has been narrowly confined. Thus under 5(9) it has power to modify or supplement the terms of an order if there has occurred a material change of conditions,[23] or if the applicant fails to abide by material representations made in the application upon which the order is based.[24]

It is true also that the Commission has certain other limited powers to modify an effective order. But the authorities relied upon by the majority are not as broad as suggested. Thus, in United States v. Rock Island Motor Transit Co.,[25] cited approvingly in American Trucking Ass'ns, Inc. v. United States,[26] the Supreme Court held that the Commission has implied power to reserve jurisdiction to make further limitations, restrictions or modifications in order to insure that the motor service of a railway controlled motor carrier remains supplemental or auxiliary to the train service of the railway. The National Transportation Pol-

21. See Northeast Airlines, Inc. v. CAB, 331 F.2d 579 (1st Cir. 1964). Cf. Isbrandtsen Co. v. United States, 96 F.Supp. 883, 887–889 (D.C.1951), aff'd, 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706 (1952).

22. See CAB v. Delta Air Lines, Inc., 367 U.S. 316, 328, 81 S.Ct. 1611, 1620, 6 L. Ed.2d 869 (1961): " * * * [T]he power to reconsider * * * [is not] the lever for 'nullify[ing]' an express provision of the Act.' "

23. City of New Orleans v. Texas & N. O. R. Co., 5 Cir., 195 F.2d 882, 886 (1952); City of New Orleans v. Texas & Pac. Ry., 5 Cir., 195 F.2d 887, 889 (1952).

24. Baggett Transp. Co. v. United States, 206 F.Supp. 835, 842 (N.D.Ala.1962).

25. 340 U.S. 419, 71 S.Ct. 382, 95 L.Ed. 391 (1951).

26. 355 U.S. 141, 154, 78 S.Ct. 165, 2 L. Ed.2d 158 (1957).

icy [27] and the specific policy commitment embodied in the proviso to 5(2) (b) (unrelated to the type of merger here involved) [28] were held to give rise to such an implied power; the source and scope of the power implied were thus severely limited. Indeed, as the Supreme Court has since observed:

" * * * [T]he Court in Rock Island was very careful to limit its holding to the particular modification made in that case." [29]

In addition, neither *Rock Island* nor *American Trucking Ass'ns* involved the question whether the Commission has power to postpone the determination of terms and conditions upon the sole ground that it wishes to expedite the effective date of its order. [30] *Rock Island* involved a challenge not to the validity of an original order but to the Commission's power to supplement an originally uncontested order by an "additional requirement," [31] in order to "insure that the service *remains* auxiliary or supplemental * * * to insure that the operations *will continue* as auxiliary or supplemental to the train service." [32] [emphasis supplied.] And *American*

*Trucking Ass'ns* involved a reservation of jurisdiction to impose the same sort of conditions if required "by reason of material changes in conditions or circumstances * * *." [33] The power asserted by the Commission in the instant case cannot be justified as necessary to insure future compliance with already promulgated terms and conditions, or to provide for changing circumstances.

Finally, it is true that in American Trucking Ass'ns, Inc. v. Frisco Transp. Co., [34] also relied on by the majority, the Commission was held to have the power under section 17(3) of the Act to correct clerical errors in a certificate of public convenience after its issuance. [35] But that case, which, as the Supreme Court found, concerned "the correction of inadvertent ministerial errors", [36] seems to me not germane to the issue here presented; indeed, all cases cited by the majority serve to put in proper focus the extraordinary nature of the power here contended for.

On the other hand, in United States v. Seatrain Lines, Inc., [37] it was held that the Commission, notwithstanding a purported reservation in the certificate, [38]

27. 54 Stat. 899.

28. *"Provided,* That if a carrier by railroad subject to this chapter, or any person which is controlled by such a carrier, or affiliated therewith within the meaning of paragraph (6) of this section, is an applicant in the case of any such proposed transaction involving a motor carrier, the Commission shall not enter such an order unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." 54 Stat. 906, 49 U.S.C. § 5(2) (b).

29. CAB v. Delta Air Lines, Inc., 367 U.S. 316, 333, 81 S.Ct. 1611, 1623 (1961).

30. These cases cannot be said to apply a fortiori, as the majority suggests, on the ground that "here [the] carrier will have consented" to the reservation of power to impose conditions. Acceptance by the respective carriers in the *Rock Island* and the *American Trucking Ass'ns*

cases of the certificate with its reservation clause in effect constituted consent.

31. 340 U.S. 419, 443, 71 S.Ct. 382 (1951).

32. Id. at 435, 71 S.Ct. at 391.

33. 355 U.S. 141, 154, 78 S.Ct. 165, (1957).

34. 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958).

35. Id. at 144–146, 79 S.Ct. 170.

36. Id. at 145, 79 S.Ct. at 177.

37. 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947). In connection with the *Seatrain* case, the Supreme Court has observed: " * * * both administrative and judicial feelings have been opposed to the proposition that the agencies may expand their powers of reconsideration without a solid foundation in the language of the statute." CAB v. Delta Air Lines, Inc., 367 U.S. 316, 334, 81 S.Ct. 1611, 1623 (1961).

38. The certificate contained a provision that it was subject "to such terms, conditions, and limitations as are now *or may hereafter be,* attached to the exer-

has no power to change or supplement terms originally imposed because it has changed its policy.

Undoubtedly, mergers such as this present many intricate, difficult and challenging problems which cannot be resolved at once. Acknowledging the heavy burdens and the great responsibility which the Commission bears in passing upon them, and however desirable it is to expedite a merger to carry out the National Transportation Policy, the Commission's action must be taken within the framework of the statutory command and not by shortcuts which may impinge upon the rights of parties and the interest of the public.

> "[T]he fact is that the Board is entirely a creature of Congress and the determinative question is not what the Board thinks it should do, but what Congress has said it can do. * * * [T]o the extent there are uncertainties over the Board's power to alter effective certificates * * * the specific instructions set out in the statute should not be modified by resort to such generalities as 'administrative flexibility' and 'implied powers.'" [39]

Plaintiffs further attack the order authorizing the merger and its immediate consummation as invalid, since those terms and conditions specified in Appendix G were imposed by the Commission without notice or an opportunity to be heard in violation of their statutory and constitutional rights. The Commission's order of September 16 granting reconsideration neither noticed nor commented on plaintiffs' contentions in this respect. Commission counsel admitted that the plaintiffs "did not have an opportunity for a hearing focused on this type of protective condition." [40] It is urged that since the plaintiffs have now been granted a hearing with respect thereto, their plea is rendered moot. The defendants make the additional point that despite the lack of an earlier hearing on the protective conditions the plaintiffs were not injured, since the terms of the order on reconsideration provide sufficient protection against the impact of immediate consummation, a contention hereafter considered—indeed, they say that implicit in the September order is a finding to this effect.

These arguments hardly answer persuasively plaintiffs' basic contention that since the traffic conditions were part and parcel of Appendix G, which was promulgated in claimed violation of statutory and constitutional requirements, they necessarily fall with Appendix G and are void for the same reason, and hence cannot serve as the basis for a finding by the Commission, explicit or implicit, that it is in the public interest for the merger to be put into effect immediately and in advance of reconsideration of the matters at issue—in short, the merits of the plaintiffs' claim in this respect before the September 16 report cannot be destroyed by the issuance of that report, the terms of which were also put into effect without notice or hearing. While we do not, at this juncture of the case, definitively determine the plaintiffs' various contentions, they are indeed of substance.

As the record now stands, plaintiffs have, in my considered judgment, shown probability of success in their challenge to the validity of the Commission's original order and its order on reconsideration. They also make a substantial showing with respect to the other criteria, enumerated in Eastern Air Lines, Inc. v. CAB.[41]

A strong case of irreparable injury is made since, as a practical matter, immediate consummation of the merger renders illusory the objecting carriers' right to a meaningful judicial review of administrative action. Parties challenging the legality of a Commission order are

---

cise of such authority by the Commission." [emphasis supplied] 329 U.S. 424, 427, 67 S.Ct. 435 (1947).

39. CAB v. Delta Air Lines, Inc., 367 U.S. 316, 322–325, 81 S.Ct. 1611 (1961).

40. Transcript, p. 106.

41. 261 F.2d 830 (2d Cir. 1958). See also, Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958).

entitled to a judicial review of its determination upon the findings and the record upon which the Commission authorized consummation, and not upon a record yet to be made with respect to essential terms and conditions required under section 5(2) (b).[42] At this time, with the merger about to become fact, none can forecast the protective terms and conditions which the Commission upon rehearing will determine meet the statutory requirement that the merger be consistent with the public interest. None can divine what modifications will be made in traffic conditions, or whether the indemnification requirement will be continued at all, or the nature, duration or scope of any revisions of or additions to either, both or any of the requirements enumerated in Appendix G.

Interestingly, as the majority observes:

"When this [further hearing and reconsideration] has been completed we may find provisions carefully tailored to prevent or at least minimize the feared manipulation or, conceivably, financial provisions of an entirely different character; at the very least we will have a record and findings as to the effect on these carriers or such provisions as are imposed." [43]

The parties are entitled to that record before and not after consummation.

A post-merger judicial review of such final terms and conditions as the Commission may hereafter determine will afford no real remedy if in fact the Commission's action is found contrary to law.

The Court, upon such a review, does not itself have the power to prescribe adequate protective terms. Thus, if the Court concluded that the protective conditions as hereafter determined by the Commission fail to support the essential and ultimate finding that the merger was consistent with the public interest, or that in other respects there are infirmities in the Commission's finding and order, its power is limited to remanding to the Commission for further consideration,[44] a time-consuming process during which the carriers, whose continued existence the Commission has found essential in the public interest, may find themselves in a state of rapid deterioration. While alternatively, if protective requirements were found grossly inadequate, the Court has the power to direct the unscrambling of the merger, all agree this is utterly unrealistic. Another alternative suggested by the Court, a gentle nudging of the Commission, would, under the procedure outlined, also consume much time while the roads face continued serious impairment.[45] The practical futility of a review of the Commission's alleged power under section 5(2) (b) to approve immediate consummation upon the findings to be made thereafter, justify the grant of interlocutory injunctive relief during the pendency of the rehearing and reconsideration of the protective terms.[46]

The defendants press that despite the elimination of the indemnity provision no irreparable injury will be visited upon the protected carriers. They urge that pending reconsideration, the con-

**42.** See United States v. Chicago, M., St. P. & P. R.R., 294 U.S. 499, 510, 55 S.Ct. 462, 79 L.Ed. 1023 (1935).

**43.** Supra, p. 976.

**44.** FPC v. Idaho Power Comm'n, 344 U.S. 17, 20–21, 73 S.Ct. 85, 97 L.Ed. 15 (1952); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656 (1940); Crolley v. Tatton, 249 F.2d 908, 912 (5th Cir. 1958), cert. denied, 356 U.S. 966, 78 S.Ct. 1005, 2 L.Ed.2d 1073 (1958).

**45.** The majority states: "If we should consider the new conditions so inadequate for the protected carriers or injurious to others as to violate the law, * * * we are confident we could inform the Commission in a way it would thoroughly understand. During the pendency of review of revised conditions and such a possible remand, new conditions for the benefit of the protected roads would remain in effect except as we otherwise ordered." Supra, p. 980.

**46.** See Breswick & Co. v. United States, 134 F.Supp. 132, 141 (S.D.N.Y.1955), rev'd on other grounds sub. nom. Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957).

tinuance of the traffic conditions in Appendix G, plus the Commission's power to award retroactive indemnification, adequately protect the three carriers to assure the vitality of their services—services which the Commission found the "public interest dictates * * * be preserved." [47] The protected carriers challenge the adequacy of this interim protection, stressing, particularly with respect to the traffic conditions, the same matters they previously urged required reconsideration of Appendix G. We need not quarrel at this point with the defendant's contention that implicit in the Commission's order on reconsideration is a "finding" that the continuance of the traffic conditions, together with the other terms of the order on reconsideration provide the necessary interim protection until the Commission renders its decision on reconsideration. But equally implicit in the Commission's order for reconsideration is a "finding" that the protective conditions enumerated in Appendix G, and imposed therein as an integrated unit, left something to be desired in the way of protection—that the objections advanced by the independent carriers were of substance. As much was acknowledged by the Commission when it noted that the three protected carriers "have raised valid issues as to the interpretation, application, scope and other aspects of the protection." [48]

As to whether the public interest will be adversely affected by a stay, it must be borne in mind that the maintenance of efficient and unimpaired service by the complaining protected and the unprotected carriers is as essential to the public and to the shippers and communities serviced by those lines as is the service of the Penn-Central group. The public includes those dependent for transportation upon all the carriers involved in this proceeding.[49] Whatever benefits in the way of increased service and efficiency of operation and modernized equipment are anticipated from the merger cannot be realized for a substantial period. Clearly this is not a case where the granting of an injunction would have an immediate adverse impact upon the public. Realistically, what is involved in granting the injunction is deferring, for a brief period, the prospective and uncertain benefits that flow from the merger in order similarly to defer the detriments which also flow from it.

Preserving the status quo pending reconsideration of substantial issues would not work great injury to the public beneficiaries of the merger. On the other hand, as the Commission itself stressed, the impact of competition from the merged lines may impair the efficiency of the other carriers' operations and render them substantially less capable of providing adequate service.

The dire consequences foreseen by some for the bankrupt New Haven hardly finds support in the facts. The estimates of time required for negotiations among the various parties and necessary activities to conclude statutory approval by both the Commission and the reorganization court extend up to a two-year period. As New Haven representatives candidly conceded upon argument, there is no reason why these activities cannot run apace while the Commission reconsiders and finally determines the protective requirements issues.

The apprehension voiced upon the argument as to continued governmental financial support of the New Haven in the event consummation is delayed now appears to have been unwarranted in view of a public announcement by the governors of two states as this opinion is drafted.[50] Finally, the plight of the New Haven cannot overcome counterbal-

---

47. 327 I.C.C. 475, 529 (1966).

48. Report on Reconsideration, p. 37.

49. 49 U.S.C. § 5(2) (c) : "In passing upon any proposed transaction * * * the Commission shall give weight to the following considerations * * * (1) The effect of the proposed transaction upon adequate transportation service to the public; * * *."

50. New York Times, September 28, 1966.

ancing adverse considerations confronting the independent and smaller lines.

The alleged dollar injury to the Penn-Central has been cast in terms of a prospective annual savings of eighty million dollars which, however, admittedly will not be realized in full scope until the end of an eight-year period. Counterbalancing these claimed potential gains are the losses likely to be visited upon the protected and unprotected carriers which, in the instance of one it is asserted would be felt almost immediately at a rate in excess of four million dollars.[51] Again, were a stay to be granted, what is involved is a deferment of benefits for a short period of time as against substantial losses to lines which may not be able to survive.

It is true that "in large cases, as in small" the standards which govern injunctive relief are constant. But the fact that this is a large merger—said to be the largest in the history of the railroad industry—and that the anticipated savings to the merged lines will run into the millions annually, with consequential benefits to the public in terms of more efficient service and possible lower rates, cannot serve to override the rights of smaller lines or the public they serve.

This merger proceeding has been before the Commission for over four and one-half years. It cannot be consummated before November 1.[52] Upon the argument it was optimistically estimated that reconsideration of the issues as to which the reopening was granted could be concluded within six months.[53] The majority is even more sanguine as to the time required, and appropriately observe that further proceedings before the Commission need not be lengthy, particularly since the contending parties appear well prepared to present and support their various contentions. Expeditious action

by the Commission could hasten the ultimate decision. Indeed, the six months estimate now seems generous rather than optimistic in the light of most recent action. The Commission has set the hearing on the open issues for October 31. Significantly, in its latest order, and commendably, the Commission directed that a recommended decision by the Examiners be omitted and that the record be considered certified to the Commission for initial decision. In the light of this latest development, there appears to be no reason why a report cannot be rendered reasonably soon after commencement of the hearing or by the end of the year.

Considering that substantial issues exist with respect to the Commission's power to direct immediate consummation while essential terms and conditions of the merger remain undetermined, and weighing all the other relevant factors which favor or militate against injunctive relief, it does not appear that a slight delay beyond November 1, to enable the Commission to conclude the pending proceedings, which hopefully may resolve many of the objections now urged against consummation, would result in undue injury to either the applicants or the public interest. These plaintiffs have made a substantial showing which brings into question the legality of the merger and also have made a showing of irreparable injury if it is permitted to proceed at this time on this basis.

The references to the Commission's devotion to duty, its expertise, its knowledgeability and its broad administrative powers as against the Court's limited power of judicial review, I submit, with due deference to my colleagues, are quite irrelevant to the issues presented on this motion.

51. Transcript, p. 189. The Hearing Examiners found, at p. 365 of their Report, that: "[I]n the event the proposed merger were approved and D&H were to remain an independent railroad, * * *

it would suffer a material loss of traffic as a direct result of the proposed merger * * *."

52. Transcript, p. 28.
53. Transcript, p. 107.

In my judgment plaintiffs are entitled to an interlocutory injunction, at least until the Commission has made its final determination upon its reconsideration of the matters specified in its order of September 16.